[No. 65475-1.   En Banc.]

Argued February 4, 1998.     Decided June 11, 1998.

THE STATE OF WASHINGTON, *Respondent*, v. KEVIN YOUNG, *Petitioner.*

ALEXANDER and JOHNSON, JJ., dissent in part by separate opinion.

*Lise Ellner* of *Department of Assigned Counsel,* for petitioner.

*John W. Ladenburg, Prosecuting Attorney,* and *Barbara L. Corey-Boulet* and *Donna Y. Masumoto, Deputies,* for respondent.

*Dino G. Sepe* and *David Zuckerman* on behalf of Washington Association of Criminal Defense Lawyers and American Civil Liberties Union, amici curiae.

TALMADGE, J. — We are asked in this case to determine if a police action constituted a disturbance of a person's private affairs without lawful authority under article I, section 7 of the Washington Constitution. We hold the test for a disturbance of a person's private affairs under article I, section 7 is a purely objective one, looking to the actions of the law enforcement officer, thus rejecting the test for a seizure under the Fourth Amendment articulated by the United States Supreme Court in *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991). Applying our objective test, we hold, under the totality of the circumstances here, the officer did not disturb Young's private affairs and affirm the decision of the Court of Appeals.

## ISSUE

Was Young "disturbed in his private affairs . . . without authority of law" under article I, section 7 of the Washington Constitution when the police approached him at night in a patrol car while he was on a public street, shining a spotlight on him?

## FACTS

Deputy Sheriff Robert Carpenter, who had been a patrol officer for nearly all of his 12 years of service with the Pierce County Sheriff, was assigned to the Lakewood precinct and University Place.[1] On August 24, 1994, he was working a swing shift in an area (Tillicum, McChord gate area, Ponder's Corner, and the south end of South Tacoma Way) considered to have a high incidence of narcotics activity. He said during the summer of 1994, the incidence of

---

[1]The facts are all taken from Carpenter's suppression hearing testimony. He was the only witness at the hearing.

open narcotics activity in that area was so high, he made at least two or three narcotics arrests during every shift, predominantly for possession or sale of crack cocaine and methamphetamine.

At 9:40 P.M., Carpenter was on Lincoln Avenue in the vicinity of the McChord Air Force Base gate. He spotted Kevin Young standing on the corner of Lincoln and Chicago, talking to a young woman, but did not observe anything relating to Young that aroused his suspicions. Carpenter testified he did not recognize Young, and, because he tries to get to know the people in his area of responsibility, he stopped his patrol car, exited the vehicle, and talked to Young. He asked how Young was doing, learned Young's name was Kevin Young, and returned to his patrol car. He testified he did not recall any other details of his conversation with Young. He did not search Young, or ask to search him. He described the meeting as a social contact.

After Carpenter returned to his car, he drove off northbound on Lincoln, down a hill. He stopped his car and radioed for a criminal history records check on Kevin Young. Carpenter asked for the criminal records check because he did not know Young and because the area had a high incidence of narcotics activity. The check revealed Young had a very extensive background in narcotics sales with prior narcotics arrests.

By this time, Carpenter had parked a half block downhill on Lincoln, away from Young. After he received the criminal history information, he resumed driving. While looking in his rear view mirror, Carpenter saw Young out in the middle of the street, apparently watching to see where Carpenter was driving—"it appeared to me that he was looking to see if I was leaving the area." Report of Proceedings at 12, 14. Because Carpenter had proceeded down Lincoln, the crest of the hill would have prevented him from seeing Young had Young not mounted the crest in an apparent attempt to see where Carpenter had gone.

Carpenter then turned his vehicle around and, at a normal speed, headed back up Lincoln toward Young.

Young, walking at a fast pace, began moving toward a bushy area near an apartment complex. Carpenter then speeded up. As Carpenter drove up the hill, he shined the patrol vehicle spotlight on Young when Young was about three or four feet from a tree. He saw Young walk behind the tree, crouch down, and toss something about the size of a small package into the area near the tree. Young continued walking, now away from the tree, and at a very fast pace. After he was away from the tree, he "stopped running" and began walking. Report of Proceedings at 12.

Carpenter drove to the opposite side of the street, stopped his patrol car close to the tree, and exited the vehicle. He asked Young to stop. Then he retrieved the object he saw Young dispose of behind the tree. Carpenter described the object as half a Coke can with a charred bottom, containing a rock-like substance that appeared to be crack cocaine.

In answering the question as to why he stopped Young after he had seen Young dispose of the package, Carpenter said: "I believed he was trying to dispose of some type of contraband, narcotics or something, that he didn't want me to find on his possession at the time, and I believed that his actions were suspicious enough for me to check and see what that was." Report of Proceedings at 17. After retrieving the can, he arrested Young for possession of a controlled substance. Carpenter testified Young was not free to leave after he told him to stop, but he did not direct Young to stop at any time other than the single instance after he saw him throw the object behind the tree.

The State charged Young with unlawful manufacturing of an imitation controlled substance, pursuant to RCW 69.52.030(1).[2] Young moved to suppress the evidence, consisting of the half Coke can and its contents, pursuant

---

[2]RCW 69.52.030(1) provides: "It is unlawful for any person to manufacture, distribute, or possess with intent to distribute, an imitation controlled substance. Any person who violates this subsection shall, upon conviction, be guilty of a class C felony." The Legislature enacted Chapter 69.52, Imitation Controlled Substances, in 1982, in response to the "growing number of injuries and deaths" stemming from imitation controlled substances. RCW 69.52.010.

to CrR 3.6. At the conclusion of the hearing, the trial court granted Young's motion to suppress:

> The defendant is deemed to have been seized at the point the deputy illuminated the defendant with the spotlight. At that point, the deputy had no reasonable articulable suspicion to believe the defendant was involved in criminal activity, and therefore was not entitled to detain him. Any evidence discovered as a result of such detention is inadmissible.

Clerk's Papers at 33. The trial court entered findings of fact and conclusions of law on the suppression. As a result of the suppression of the evidence, the State moved for an order of dismissal without prejudice, and the trial court granted the motion.

The State appealed. Division Two reversed the trial court in a published opinion. *State v. Young*, 86 Wn. App. 194, 935 P.2d 1372 (1997). The Court of Appeals held Young was not seized within the meaning of the Fourth Amendment when Carpenter shone the spotlight on him, citing *Hodari D.*[3] The Court of Appeals applied the analysis of *Hodari D.* to WASH. CONST. art. I, § 7 as well. On Young's petition, we granted review.

## ANALYSIS

This case presents an important issue of search and seizure law. The Court of Appeals, holding *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), comports with article I, section 7, found no seizure occurred. *Young*, 86 Wn. App. at 203. We must decide first whether the Fourth Amendment analysis in *Hodari D.* is consistent with article I, section 7 of the Washington Constitution.

A.   The *Hodari D.* Test for "Seizure"

The United States Supreme Court held in *Hodari D.* that

---

[3]Young did not argue the Fourth Amendment in his Petition for Review or his supplemental brief. Accordingly, we do not address that issue.

a seizure within the meaning of the Fourth Amendment is a mixed objective/subjective test. In that case, an officer driving an unmarked patrol car in a high-crime area of Oakland, California, encountered four or five youths on the street. When the youths saw the patrol car approach, they apparently panicked and took flight. *Hodari D.*, 499 U.S. at 622-23. Suspicious, the police gave chase. One of the youths, Hodari, discarded what appeared to be a small rock moments before an officer tackled him. The officer recovered the rock, which was later identified as crack cocaine. *Id.* at 623.

The juvenile court denied Hodari's motion to suppress the evidence. The California Court of Appeal reversed, holding Hodari had been "seized" when he saw the officer running toward him. The court found the seizure unreasonable, and suppressed the evidence as the fruit of the illegal seizure. *Id.*

The United States Supreme Court addressed only the issue of whether a seizure of Hodari had occurred before or after the physical apprehension by the officer. If no seizure occurred before Hodari discarded the cocaine, that is, if no seizure occurred simply as a result of the officer's running toward Hodari, then Hodari simply abandoned the contraband, the police lawfully recovered it, and it was not the fruit of an illegal seizure. On the other hand, if the fact of the officer's running toward Hodari in and of itself constituted a seizure, then it was unreasonable and in violation of the Fourth Amendment because Hodari's behavior did not give the officers probable cause to detain him; all he had done was run from the approaching patrol car.

The Supreme Court in *Hodari D.* formulated the question narrowly: can a seizure occur even though the subject does not yield? The Court held in the negative. *Id.* at 626. Citing *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the Court identified two ways in which a seizure may occur: a seizure occurs "when the officer, by means of physical force or a show of authority, has in some way restrained the liberty of the citizen." In *Ho-*

*dari D.,* as in the present case, there was no application of physical force at the time both defendants assert the seizure occurred, so the threshold question in both cases is whether the actions of the officer constituted a show of authority that in some way restrained the liberty of the citizen.

*Hodari D.* held there can also be no seizure until the citizen has yielded to the show of authority. *Hodari D.,* 499 U.S. at 626. Thus, if the suspect runs away, he or she has not yielded to authority, and there has been no seizure. If the suspect yields to the show of authority by standing his or her ground, then a seizure is deemed to have occurred. *Hodari D.* introduced a *subjective* element into the definition of a Fourth Amendment seizure: the action of the subject, either to disregard the show of authority or to yield to it, determines the seizure question. The Court based its analysis in some measure on Proverbs 28:1: "The wicked flee when no man pursueth."

In reaching its conclusion, the Court had to explain its earlier holding in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), where the Court said: "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Under the *Mendenhall* formulation, the test is objective, not subjective. The *Hodari D.* Court concluded *Mendenhall* is not in conflict because *Mendenhall* says

> a person has been seized "only if," not that he has been seized "whenever"; it states a *necessary*, but not a *sufficient*, condition for seizure—or, more precisely, for seizure effected through a "show of authority." *Mendenhall* establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.

*Hodari D.,* 499 U.S. at 628. Thus, the *Mendenhall* test is

only a first, necessary step in the determination of a seizure. *Hodari D.* added an additional prong to the test: not only must a reasonable person believe the show of authority requires him or her to yield, but the person involved must *in fact* yield to the show of authority in order for a seizure to exist. Only if both prongs are met does a seizure occur. *See also Florida v. Bostick,* 501 U.S. 429, 439, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (court must determine whether police conduct would have communicated to a reasonable person that the person was not free to terminate the encounter).

This analysis has been severely criticized.[4] "The *Hodari D.* decision represents a revision of the United States Supreme Court's definition of seizure . . . as well as a departure from that Court's precedent." *Commonwealth v. Stoute,* 422 Mass. 782, 665 N.E.2d 93, 96 (1996) (citation omitted). *Hodari D.* may permit the police to "sanitize an unlawful, suspicionless 'encounter' by construing the subject's non-cooperation as 'suspicious' or 'flight' and then claiming 'probable cause' to arrest." *State v. Quino,* 74 Haw. 161, 840 P.2d 358, 366 (1992), *cert. denied,* 507 U.S. 1031, 113 S. Ct. 1849, 123 L. Ed. 2d 472 (1993) (Levinson, J., concurring).[5] Plainly, the Court's *Hodari D.* test shifted the Fourth Amendment focus in large measure from the

---

[4]*See* 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.3(d), at 125 (3d ed. 1996) (result in *Hodari D.* is "incorrect"); Ronald L. Bacigal, *The Right of the People to Be Secure,* 82 Ky. L.J. 145 (1993/94); Bruce A. Green, *"Power, Not Reason": Justice Marshall's Valedictory and the Fourth Amendment in the Supreme Court's 1990 Term,* 70 N.C. L. Rev. 373 (1992); Thomas K. Clancy, *The Future of Fourth Amendment Seizure Analysis After* Hodari D. *and* Bostick, 28 Am. Crim. L. Rev. 799 (1991).

[5]*See State v. Nettles,* 70 Wn. App. 706, 855 P.2d 699 (1993), *review denied,* 123 Wn.2d 1010, 869 P.2d 1085 (1994) (Baker, J., dissenting):

The defendant was walking on a city sidewalk on an early summer evening. He had his hands in his pockets. A uniformed officer turned on her yellow wig-wag lights, stopped her patrol car near him, and asked him and his companion to step over to her car. The defendant turned toward her; his companion continued slowly walking away.

The officer had been responding to a radio dispatch to "check for narcotics activity" at a nearby intersection. *Her suspicions were aroused because three men, including the defendant, split up and began walking when they saw her police car go by.*

reasonableness of police conduct to the person's subjective reaction to police conduct.

Similarly, critics note Fourth Amendment protections should not depend on a citizen's subjective state of mind. Under *Hodari D.*, the moment at which seizure occurs is "governed by the citizen's reaction, rather than the officer's conduct." *Hodari D.*, 499 U.S. at 643 (Stevens, J., dissenting). Justice Stevens thought the Fourth Amendment would be better served by adherence to the rule that allowed the police to know in advance whether their contemplated conduct would implicate the Fourth Amendment, rather than depend on the citizen's reaction to that conduct. *Id.* at 643-44.

Because *Hodari D.* raised the bar for those asserting a seizure, and substantially changed preexisting Supreme Court law, several states have rejected *Hodari D.*, preferring to analyze seizure issues under their own constitutions.[6]

---

*Id.* at 713 (emphasis added). What did not even arise to the level of the officer's hunch of unlawful behavior suddenly ripened into a suspicion by the subjects' flight.

[6]*State v. Oquendo*, 223 Conn. 635, 613 A.2d 1300, 1309-10 (1992) (*Hodari D.* does not comport with Connecticut's common law of arrest); *State v. Quino*, 74 Haw. 161, 840 P.2d 358, 362 (1992) (rejecting *Hodari D.* and adhering to *Mendenhall* as providing greater protection under Hawaii constitution), *cert. denied*, 507 U.S. 1031, 113 S. Ct. 1849, 123 L. Ed. 2d 472 (1993); *State v. Tucker*, 626 So. 2d 707, 712 (La. 1993) (*Hodari D.* offers less privacy protection than Louisiana constitution requires); *In re Welfare of E.D.J.*, 502 N.W.2d 779, 781 (Minn. 1993) (refusing to depart from court's pre-*Hodari* approach); *State v. Tucker*, 136 N.J. 158, 642 A.2d 401, 405 (1994) (refusing to make "radical" change in New Jersey seizure law adoption of *Hodari D.* would require); *People v. Madera*, 153 Misc. 2d 366, 580 N.Y.S.2d 984 (1992), *aff'd on other grounds*, 82 N.Y.2d 775, 604 N.Y.S.2d 538, 624 N.E.2d 675 (1993); *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 773-74 (1996) (adhering to *Mendenhall* approach adopted by Pennsylvania in 1977 case).

Cases following *Hodari D.* include: *Gibbons v. State*, 676 So. 2d 956 (Ala. Crim. App. 1995); *Perez v. State*, 620 So. 2d 1256, 1258 (Fla. 1993) (Florida constitution specifically prohibits court from finding greater protections in Florida constitution than those in Fourth Amendment); *State v. Agundis*, 127 Idaho 587, 903 P.2d 752, 757 (App. 1995) (even though Idaho constitution offers greater privacy protection than Fourth Amendment, *Hodari D.* complies with Idaho constitution); *Tom v. Voida*, 654 N.E.2d 776 (Ind. App. 1995); *Brummell v. State*, 112 Md. App. 426, 685 A.2d 835 (1996); *Harper v. State*, 635 So. 2d 864, 867 (Miss. 1994) (*Hodari D.* comports with preexisting Mississippi law). In one case that applied

In summary, *Hodari D.* is a departure from previous Supreme Court cases on the definition of seizure under the Fourth Amendment. *Hodari D.* added a subjective test to seizure law: absent physical force, no seizure occurs unless the citizen decides to yield to the show of authority.

B.  *Gunwall* Analysis of Disturbance of Private Affairs Under Article I, Section 7

In *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4TH 517 (1986), we adopted six criteria to employ in determining whether WASH. CONST. art. I, § 7 provides greater protection to Washington citizens than the Fourth Amendment: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of state or local concern.

As we noted in *State v. Young*, 123 Wn.2d 173, 179-80, 867 P.2d 593 (1994), examination of the first, second, third, and fifth criteria all lead to the conclusion that article I, section 7 provides greater protection of privacy than the Fourth Amendment. Thus, it is not necessary to reexamine those criteria here. *State v. Boland*, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990). Likewise, because state "law enforcement measures are a matter of local concern," *Young*, 123 Wn.2d at 180, it is not necessary to analyze the sixth criterion. Only the fourth criterion, preexisting state law, warrants examination in this case.

No Washington case has discussed whether *Hodari D.* comports with Washington law. The Court of Appeals in this case simply adopted *Hodari D.* without substantial discussion.[7] Previous Washington cases adopted the *Mendenhall* test of a seizure to analyze a disturbance of a person's private affairs under article I, section 7:

the *Hodari D.* standard, *State v. Cronin*, 2 Neb. App. 368, 509 N.W.2d 673, 676 (1993), the court noted, "Nebraska has neither an explicit constitutional right of privacy nor a history of affording individuals greater rights than are afforded by the federal Constitution."

[7] *Hodari D.* has received scant attention in Washington courts. Justice Alexander cited it in his dissent without discussion in *State v. Thorn*, 129 Wn.2d 347, 356, 917 P.2d 108 (1996) (Alexander, J., dissenting). Division Two employed the

> A person is "seized" within the meaning of the Fourth Amendment only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . . There is a "seizure" when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*State v. Stroud*, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) (footnote omitted) (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), *review denied*, 96 Wn.2d 1025 (1982); *accord State v. Thorn*, 129 Wn.2d 347, 351-52, 917 P.2d 108 (1996).

Washington search and seizure law stemming from *Terry* and proceeding through *Mendenhall* is well-established. Were we to adopt *Hodari D.* and its new definition of seizure for a disturbance of private affairs under article I, section 7, we would be departing from our precedents and the greater protection of privacy afforded Washington citizens under article I, section 7 of the Washington Constitution. Given the erosion of privacy the *Hodari D.* decision entails, we adhere to our established jurisprudence and reject application of the test for a seizure articulated in *Hodari D.* to a disturbance of private affairs under article I, section 7.

## C. Article I, Section 7 in this Case

Like those asserting a seizure under the Fourth Amendment, *State v. Thorn*, 129 Wn.2d 347, 354, 917 P.2d 108 (1996), Young has the burden of proving a disturbance of his private affairs under article I, section 7. Young maintains being illuminated with the police car spotlight constituted a seizure. Further, because the seizure was without probable cause, the subsequent recovery of the imitation controlled substance was unlawful, and the evidence of it should be suppressed. Because the police did not

*Hodari D.* definition of seizure in *State v. Perea*, 85 Wn. App. 339, 344, 932 P.2d 1258 (1997), without discussion. Division Three cited *Hodari D.* in *State v. Gleason*, 70 Wn. App. 13, 16, 851 P.2d 731 (1993), but only as support for the *Mendenhall* objective test. Judge Baker mentioned *Hodari D.* in a footnote to his dissent in *State v. Nettles*, 70 Wn. App. 706, 714 n.1, 855 P.2d 699 (1993).

apply physical force to Young, the seizure question becomes, was the illumination by the spotlight such a show of authority that a reasonable person would have believed he or she was not free to leave. That Young actually did leave makes no difference; the test is objective.

Young asserts he "had a privacy interest in being free to move about in a public place without being accosted by the police." Supplemental Br. of Pet'r at 6. As noted above, however, the police are permitted to engage persons in conversation and ask for identification even in the absence of an articulable suspicion of wrongdoing. The amicus brief the Washington Association of Criminal Defense Lawyers and American Civil Liberties Union jointly filed goes too far in asserting, "This Court, under Article I § 7, cannot allow police this unfettered discretion to direct their power towards a person who is doing nothing more than exercising his right to walk down the street unhindered by government authority." Amicus Br. at 12. Article I, section 7 does not forbid social contacts between police and citizens: "[A] police officer's conduct in engaging a defendant in conversation in a public place and asking for identification does not, alone, raise the encounter to an investigative detention." *State v. Armenta*, 134 Wn.2d 1, 11, 948 P.2d 1280 (1997).

This view comports with the Supreme Court's statement in *Mendenhall* that "not every encounter between a police officer and a citizen is an intrusion requiring an objective justification." *Mendenhall*, 446 U.S. at 553. The *Mendenhall* Court also said, "Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Id.* at 554. Thus, it is well-established that "[e]ffective law enforcement techniques not only require passive police observation, but also necessitate their interaction with citizens on the streets." *Tucker*, 642 A.2d at 406 (police are more than "mere spectators") (quoting *People v.*

*Mamon*, 435 Mich. 1, 457 N.W.2d 623, 628 (1990)). In *Thorn*, for example, a law enforcement officer, armed and in full uniform, who asked the defendant in a parked car at night "Where's the pipe?" did not seize the defendant. The question Young raises is whether illumination with a police car spotlight transcends a permissible interaction between the police and a citizen and rises to the level of a seizure.

Young cites no cases to support his position. He simply argues the shining of the spotlight was an intrusion into his protected privacy interests. Supplemental Br. of Pet'r at 6-9. The State cites *Mendenhall* for a list of examples of a show of authority:

> Examples of circumstance that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554-55 (citations omitted).

When Carpenter completed his social contact with Young, he had no knowledge of Young's criminal history. He drove down the street and determined from a criminal history records check, that Young had a substantial history of police contacts for drug-related incidents. This new information raised his concern about Young. Carpenter then noticed Young peering down the street in an apparent attempt to see where the deputy was, behavior suggesting Young was checking to see if "the coast was clear." These two new facts motivated Carpenter to turn his vehicle around and proceed back toward Young. These events occurred in an area known for high drug-related activity. Based on the totality of the circumstances, the deputy acted reasonably in seeking to renew his contact with Young.

▮ The shining of the spotlight in this case does not

rise to the level of intrusiveness discussed in *Mendenhall*. Carpenter did not have his siren or emergency lights on. No weapon was drawn. The police car did not come screeching to a halt near Young. Young was on a public street in public view. The shining of the light on him revealed only what was already in plain view, Young's person, and not anything he wished to keep private. The deputy did not see the contraband until Young disposed of it. "In *Young*, this court explained that 'what is voluntarily exposed to the general public' is not considered part of a person's private affairs." *State v. Goucher*, 124 Wn.2d 778, 784, 881 P.2d 210 (1994) (quoting *Young*, 123 Wn.2d at 182).[8] The illumination by the spotlight did not amount to such a show of authority a reasonable person would have believed he or

---

[8]This is consistent with our holding in *State v. Rose*, 128 Wn.2d 388, 909 P.2d 280 (1996), a search case, wherein we held illumination of the interior of a mobile home by a flashlight at night satisfied the open view doctrine:

> In accord with the reasoning in *Dunn, Lee*, and other cases cited above, we hold that the fact that a flashlight is used does not transform an observation which would fall within the open view doctrine during daylight into an impermissible search simply because darkness falls. One who leaves contraband in plain sight, visible through an unobstructed window to anyone standing on the front porch of his residence, does not have a reasonable expectation of privacy in the visible area.

> Nor is the mere use of a flashlight an intrusive method of viewing. A flashlight is an exceedingly common device; few homes or boats are without one. It is not a unique, invasive device used by police officers to invade the privacy of citizens, and is far different from the device at issue in *State v. Young*, 123 Wn.2d 173, 182-83, 867 P.2d 593 (1994). In *Young*, we held that use of an infrared device to detect heat patterns in the home, which could not be detected by the naked eye or other senses, and which could in effect enable the officer to "see through the walls" of the home, was a particularly intrusive method of viewing which went well beyond mere enhancement of normal senses. A flashlight, in contrast, does not enable an officer to see within the walls or through drawn drapes. Instead, it is a device commonly used by people in this state, and, in fact, would be an expected device for someone to use approaching a mobile home in a rural area at dusk or after nightfall.

> Officer Dekofski looked through an unobstructed window to the left of the front door while lawfully standing on the front porch. Rose simply did not have an expectation of privacy in what could be seen through that window in natural light, and the fortuity that darkness fell before Officer Dekofski could investigate the report of criminal activity does not change that fact. There was no Fourth Amendment violation as a result of the officer's observations through the unobstructed window while using a flashlight.

*Rose*, 128 Wn.2d at 398-99.

she was not free to leave, not free simply to keep on walking or continue with whatever activity he or she was then engaged in, until some positive command from Carpenter issued. To rule as Young requests that the shining of a spotlight was, in effect, a *per se* violation of article I, section 7 would call into question legitimate police patrol functions at night where the spotlight is a necessary tool to illuminate a scene. Mere illumination alone, without additional indicia of authority, does not violate the Washington Constitution. There was no disturbance of private affairs under article I, section 7 here.

## CONCLUSION

Hodari D. and Young's position represent polar extremes for analysis of the facts of this case. Under *Hodari D.*, there was no seizure under the Fourth Amendment because Young did not yield when the spotlight illuminated him. Absent a seizure, Young's discarding the contraband was voluntary and the deputy's recovery of it, lawful. Under Young's interpretation of article I, section 7, all intrusions by the police of someone in a public place are proscribed as disturbances of a citizen's private affairs. We reject both views.

We reject the introduction of *Hodari D.* and its mixed subjective/objective test into article I, section 7 jurisprudence because of the drastic change it makes in seizure law. Taking into account whether the citizen yields to the show of authority improperly changes the focus of the seizure inquiry from the conduct of the police to the state of mind of the citizen. Article I, section 7 sets a higher standard for protection of privacy than the Fourth Amendment, and plainly prevents the erosion of privacy *Hodari D.* mandates.

However, there was no violation of Young's privacy in this case because, under the totality of these circumstances, the deputy's actions did not constitute such a show of authority that a reasonable person would not believe

himself free to leave. The spotlight alone, without additional indicia of authority, did not violate article I, section 7. The spotlight did not illuminate anything Young sought to keep private. He was in the open on a public street. The spotlight did not reveal the contraband he had concealed on his person.

We affirm the Court of Appeals' reversal of the trial court's order suppressing the evidence of the imitation controlled substance.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, MADSEN, and SANDERS, JJ., concur.

ALEXANDER, J. (concurring in part, dissenting in part) — I concur with the majority's rejection of the test that was articulated in *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), for determining whether a seizure has occurred. I entirely agree with the majority's view that we should preserve the objective test for a disturbance of private affairs that has long been a part of this court's jurisprudence.

I part company, though, with the majority in its conclusion that Young was not seized or disturbed in his private affairs when he was illuminated by the police car spotlight. Although the majority correctly observes that not every encounter between a police officer and a citizen is a seizure or a disturbance of private affairs, the spotlighting of Young was such an intrusion. I reach that conclusion because, in my view, a reasonable person in Young's position would not have believed that he was free to leave once he fell under the beam of the police spotlight. In rejecting this view, the majority makes much of the fact that "[t]he spotlight did not illuminate anything Young sought to keep private," and that Young was "in the open on a public street." Majority at 515. That begs the question because, as the majority concedes, the issue is whether Young was seized and thereby disturbed in his private affairs. One is seized when a show of authority by an officer of the law would

cause a reasonable person to believe he was not free to leave. *State v. Thorn*, 129 Wn.2d 347, 352, 917 P.2d 108 (1996) (citing *Florida v. Bostick*, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)).

The majority's conclusion that the spotlighting was not such a show of authority does not hold up under these facts. Significantly, Deputy Sheriff Carpenter had just spoken to Young a few minutes before the spotlighting took place and had chosen to drive away from what he described as "social contact." Majority at 502. Nevertheless, after learning that Young had a criminal record, the deputy turned his vehicle around and headed back toward Young. As the deputy did so, he observed Young walking toward an apartment complex. This caused the deputy to increase the speed of his automobile and shine its spotlight on Young. The deputy gave no explanation for doing so and made no attempt to justify this action. Because the earlier contact with Young had been uneventful, and Young did not do anything between the time of that contact and the time the spotlight was shined on him that was unlawful or even suspicious, shining the light on Young was saying, in essence, STOP. This, in my view, was an unjustified intrusion into Young's private affairs.

This is a case of first impression. The cases that are closest factually to the present one are previous holdings by courts in this state that "[a] seizure occurs when police officers pull up to a parked vehicle and activate their emergency lights." *State v. Markgraf*, 59 Wn. App. 509, 511, 798 P.2d 1180 (1990) (citing *State v. DeArman*, 54 Wn. App. 621, 624, 774 P.2d 1247 (1989)); *see also State v. Stroud*, 30 Wn. App. 392, 396, 634 P.2d 316 (1981), *review denied*, 96 Wn.2d 1025 (1982).[9] The rule set forth in those cases seems pertinent here because it has been applied even where a parked vehicle was not pulled over by the police officer, nor

---

[9]The State inexplicably cites these cases in support of the proposition that flashing police lights upon "moving" cars constitutes a seizure, even while it quotes language from *Stroud* noting that a "parked car" was involved. Br. of Appellant at 5 (quoting *Stroud*, 30 Wn. App. at 396). It then cites three cases from other states, completely ignoring Washington case law to the contrary, to support

detained while in the process of leaving. *See Stroud*, 30 Wn. App. at 393. As a result, the message sent by the police lights was not necessarily obvious and yet a seizure was held to have occurred. Indeed, the person seized by the display of lights in *Stroud* was not even in the driver's seat, but rather was "a mere passenger." *Stroud*, 30 Wn. App. at 396. Moreover, in *Stroud*, unlike here, there had been no prior interaction between the officers and the person seized to make the subsequent seizure even more apparent. Still, the use of the lights was held to have "constituted a show of authority sufficient to convey to any reasonable person that voluntary departure from the scene was not a realistic alternative." *Stroud*, 30 Wn. App. at 396.

Similarly, here, even accepting as true Deputy Sheriff Carpenter's characterization of his initial contact with Young as a mere "social contact," it would have been quite clear to Young that their second interaction was actually serious business. Under these circumstances, the searchlight shining upon Young sent a message no less unmistakable than that sent by flashing lights to occupants of parked cars. In short, the combination of the second encounter following the first resulted in a show of authority constituting a seizure. Yet, under the permissive approach that the majority is adopting here, "it will be advantageous to the police to place a seizure at the latest possible moment so as to be able to use any earlier-revealed incriminating evidence as part of the basis for the *Terry* stop." 4 Wayne R. LaFave, Search and Seizure § 9.3(d), at 130 (3d ed. 1996). This is because the bar for what actually constitutes a "seizure" is being set so high that its purposes can now be accomplished by other means and without reasonable and articulable suspicion. Accordingly, then, the majority's acknowledgment of the "greater protection of privacy afforded Washington citizens under article I, section 7" becomes empty rhetoric. Majority at 510.

I am not suggesting, as the majority suggests Young is,

---

its proposition that "flashing lights upon an already parked car may not constitute a seizure." Br. of Appellant at 5-6.

that there is a disturbance of private affairs every time someone is illuminated by a police spotlight. There are, of course, many legitimate uses of a spotlight and there are undoubtedly instances where a person illuminated by such a light could not reasonably contend that he was seized. One of the legitimate uses of the light, of course, is to impart to an individual that the officer wants him to stop where he is. In such cases, though, the officer must possess information that would lead a reasonable person to believe that there is a substantial probability that criminal conduct has or is about to occur. Prior to the spotlight being shone here, there was no basis for such a belief. The seizure or intrusion was, therefore, unjustified. I would affirm the trial court's order suppressing evidence.

JOHNSON, J., concurs with ALEXANDER, J.