[No. 28777-7-III.   Division Three.   August 16, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. ERIC CHRISTOPHER GANTT, *Appellant*.

*Dennis W. Morgan*, for appellant.

*James P. Hagarty*, *Prosecuting Attorney*, and *Kevin G. Eilmes*, *Deputy*, for respondent.

¶1 KULIK, C.J. — Eric Gantt appeals his convictions for residential burglary, second degree possession of stolen property, and five counts of second degree identity theft. Mr. Gantt asserts (1) that he was unlawfully seized when an officer pulled behind his van, activated his emergency lights, and asked Mr. Gantt what he was doing and (2) that the subsequent warrantless search of his vehicle was invalid.

¶2 Because these facts are similar to the facts in *State v. DeArman*, 54 Wn. App. 621, 774 P.2d 1247 (1989), we

conclude that the activation of emergency lights and the questioning of Mr. Gantt constituted an unlawful seizure. Therefore, we reverse the denial of the motion to suppress and reverse the convictions.

## FACTS

¶3 At approximately 9:50 p.m. on May 7, 2009, Officer Tony Valencia of the Selah Police Department was patrolling westbound on Goodlander Road. The officer saw a minivan stopped on the street a few yards north of Goodlander Road on Goodlander Drive. Officer Valencia saw two people standing on the passenger side of the van.

¶4 A few minutes later, Officer Valencia returned eastbound on Goodlander Road. He saw the same van moved to an area in front of a driveway at the corner of Crestview Drive and Goodlander Road. Officer Valencia saw a man walking toward a residence. Officer Valencia decided to make a social contact. He activated his emergency lights and pulled up behind the van. The man returned to his van.

¶5 A woman was sitting in the van. Officer Valencia contacted the man. Officer Valencia asked the man, later identified as Mr. Gantt, what he was doing there. Mr. Gantt appeared nervous and stated that he was looking for a friend. Officer Valencia asked the name of the friend, and Mr. Gantt provided a name similar to "Elaine." Clerk's Papers at 39. The officer told Mr. Gantt that he had just seen the van stopped on the next block over and that he did not believe what Mr. Gantt was telling him.

¶6 While talking to Mr. Gantt, Officer Valencia noticed that there was an expired trip permit in the rear window of the van that had been altered from the original dates. Observing that Mr. Gantt was becoming increasingly nervous, Officer Valencia requested backup. Officer Rich Brumley contacted Officer Valencia while en route and told him that he was familiar with Mr. Gantt.

¶7 Shortly after his arrival, Officer Brumley walked over to the minivan and looked into the rear window of the

cargo area. He observed mail, unused checkbooks, a video camera, an automobile stereo with a missing faceplate, and a flashlight. Officer Brumley noticed a woman's name and a Yakima address on an item of mail.

¶8 When Officer Brumley looked through the van's side windows, he saw two large-sized duffle bags, a small ice chest, and a pearl necklace. When he looked in the open front windows, Officer Brumley saw a laptop computer between the two seats. He also noticed a small plastic bag, containing a green vegetable matter, lying on the passenger side.

¶9 Mr. Gantt denied the officers' request to search the van. Officer Brumley contacted the Yakima County Sheriff's Office to run a check on the name on the item of mail. The dispatch officer advised Officer Brumley that a woman with the same name had reported a burglary earlier that evening. Officer Brumley requested that a deputy respond to his location. When Deputy Jim Frye arrived, the officers gave Mr. Gantt *Miranda*[1] warnings and obtained a telephonic search warrant.

¶10 The State charged Mr. Gantt with one count of residential burglary, one count of possession of stolen property, and five counts of second degree identity theft.

¶11 A suppression hearing was held on stipulated facts contained in Officer Valencia's report. The parties also stipulated that Officer Valencia had activated his patrol car emergency lights.

¶12 No findings of fact were entered. The court issued an oral ruling finding that Officer Valencia initiated a social contact even though the circumstances were somewhat suspicious, that this contact was an exercise of the community caretaking function, that the activation of the patrol car lights at night did not change the contact into a detention or an illegal detention, that the expired trip

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

permit allowed for further investigation, and from that point things moved forward in a fairly logical way. The court concluded that under these circumstances the officers acted appropriately, that Mr. Gantt was not seized until the officer noticed the traffic infraction, and that the evidence was sufficiently developed to warrant an arrest.

¶13 At a stipulated facts trial, Mr. Gantt was found guilty on all counts. This appeal follows.

## ANALYSIS

¶14 *Seizure.* The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

¶15 Washington Constitution article I, section 7 states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." This provision provides greater protection than the Fourth Amendment because it focuses on the disturbance of private affairs rather than focusing on unreasonable searches and seizures. *State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009).

¶16 Whether an encounter with police is permissive or a seizure is a mixed question of law and fact, but whether the facts may be characterized as a seizure is a legal question that the court reviews de novo. *State v. Rankin*, 151 Wn.2d 689, 709, 92 P.3d 202 (2004). Mr. Gantt bears the burden of establishing that he was illegally seized. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998). If a warrantless search or seizure occurred, the State has the burden of justifying it. *State v. Jackson*, 82 Wn. App. 594, 601-02, 918 P.2d 945 (1996).

¶17 "A seizure under article I, section 7 occurs when, due to an officer's use of physical force or display of authority, an individual's freedom of movement is restrained and the individual would not believe that he is free to leave or decline a request." *State v. Beito*, 147 Wn. App. 504, 508, 195 P.3d 1023 (2008). " 'This determination is made by looking objectively at the actions of the law enforcement officer.' " *Id.* (quoting *State v. Mote*, 129 Wn. App. 276, 282-83, 120 P.3d 596 (2005)). A seizure does not necessarily occur where an officer has a subjective suspicion of a criminal activity but lacks suspicion to justify an investigative detention. *State v. O'Neill*, 148 Wn.2d 564, 576-77, 62 P.3d 489 (2003).

¶18 *Display of Authority.* The first question here is whether Officer Valencia's display of his emergency lights constituted a display of police authority.

¶19 In *Young*, an officer was patrolling an area with a high incidence of drug activity when he observed Kevin Young standing on a street corner talking to a young woman. The officer saw nothing suspicious but stopped his patrol car, got out, and asked Mr. Young how he was doing. The officer learned Mr. Young's name, then left the scene and radioed for Mr. Young's criminal history. Mr. Young had an extensive criminal history. While driving away, the officer saw Mr. Young walk out to the street, apparently watching where the officer was going. The officer turned around and drove back. When Mr. Young started walking away, the officer shined his patrol car's spotlight on him. Mr. Young walked behind a tree, crouched down, and tossed a small package near the tree. The officer asked Mr. Young to stop and retrieved the package, which appeared to contain crack cocaine. *Young*, 135 Wn.2d at 503. Mr. Young argued that he was seized when the deputy illuminated him with the spotlight. *Id.* at 510.

¶20 The court determined that "[t]he illumination by the spotlight did not amount to such a show of authority a reasonable person would have believed he or she was not

free to leave, not free simply to keep on walking or continue with whatever activity he or she was then engaged in." *Id.* at 513-14. Significantly, the court adopted a nonexclusive list of officer displays of authority that can amount to a seizure, including

> "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive conduct between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."

*Id.* at 512 (alteration in original) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

¶21 In *DeArman*, the court concluded that a motorist was seized when a police officer pulled up behind his or her car and activated full emergency lights. *DeArman*, 54 Wn. App. at 624. In *DeArman*, an officer observed a vehicle stopped at a stop sign for 45 to 60 seconds. The officer became concerned that the vehicle might be disabled because he could not tell whether the vehicle was moving. *Id.* at 622. The officer pulled in behind Mr. DeArman's vehicle and activated his emergency lights. *Id.* Mr. DeArman then drove through the intersection and pulled over 50 feet beyond the intersection. *Id.* at 623. At this point, the officer became suspicious, contacted Mr. DeArman, and asked for his identification. *Id.* The officer arrested Mr. DeArman on an outstanding warrant and discovered cocaine during a search of Mr. DeArman. *Id.*

¶22 The court concluded that Mr. DeArman was seized when the officer pulled up behind him and activated his emergency lights. *Id.* at 624. The court explained that the seizure was unreasonable because the officer did not have a reason to stop the vehicle once Mr. DeArman pulled through

the stop sign and it became apparent that the vehicle was not disabled. *Id.* at 625.

¶23 Similarly, in *State v. Stroud*, 30 Wn. App. 392, 396, 634 P.2d 316 (1981), the court determined that a legally parked car was seized when police pulled in behind the vehicle and activated their emergency lights *and* headlight high beams. The court concluded that the use of emergency and headlight high beams "constituted a show of authority sufficient to convey to any reasonable person that a voluntary departure from the scene was not a realistic alternative." *Id.*

■ ¶24 Here, Officer Valencia saw a minivan on the street with two people standing on the passenger side. A few minutes later, Officer Valencia observed the same vehicle stopped in front of a driveway. The officer saw a man walking from the van to the residence. Officer Valencia decided to make a social contact. The officer stopped behind the van, activated his emergency lights, got out of the patrol car, and asked the man what he was doing there. Mr. Gantt, appearing nervous, answered that he was looking for a friend. When asked, Mr. Gantt provided a name. At this point, Officer Valencia told Mr. Gantt that he had just seen the van one block over and that he did not believe what Mr. Gantt was saying. The officer then noticed that the van had an expired permit that had been altered.

¶25 The activation of a patrol car's emergency lights constitutes a display of authority similar to that described in *DeArman*. We conclude that Mr. Gantt was seized when Officer Valencia activated his emergency lights and asked Mr. Gantt what he was doing.

¶26 *Social Contact.* The State argues that Officer Valencia's initial contact was not a seizure, but, rather, a social contact. The State relies on *Harrington* to support its argument that Officer Valencia was conducting a social contact when he approached Mr. Gantt. This argument is unpersuasive.

■ ¶27 Social contact between a police officer and a citizen does not constitute a seizure. *Harrington*, 167 Wn.2d at 664-65. Social contact "occupies an amorphous area . . . resting someplace between an officer's saying 'hello' to a stranger on the street and, at the other end of the spectrum, an investigative detention." *Id.* at 664. A social contact between a police officer and a citizen "does not suggest an investigative component." *Id.*

¶28 The circumstances here involved an investigative component. Officer Valencia activated his emergency lights and asked Mr. Gantt what he was doing there. Moreover, in *Harrington*, the *absence* of a police car and emergency lights was one reason why the Washington Supreme Court found that the contact by the officer was, initially, a social contact. *Id.* at 665.

¶29 When Officer Valencia contacted Mr. Gantt, both men were out of their vehicles. In fact, both men were so close to the van that Officer Valencia could read the expiration date on the trip permit. The State argues that *DeArman* is distinguishable because it involved a traffic stop. This distinction is not helpful. *Young* did not involve a traffic stop. The inquiry is the same—was the display of authority sufficient to constitute a seizure? Here, the use of emergency lights and the officer's conversation constituted a display of authority by the officer. A reasonable person standing next to his or her vehicle would not believe that he or she was free to leave. As we conclude above, Mr. Gantt was seized when Officer Valencia stopped behind the van, made a show of authority by turning on the patrol car's emergency lights, and then questioned Mr. Gantt.

¶30 *Community Caretaking.* The State does not mention the term "community caretaking." Instead, the State contends, "While the circumstances may have been suspicious, the officer's social contact would have been independently justified in trying to determine whether [Mr.] Gantt was lost, or needed assistance." Resp't's Br. at 6. The State cites no authority to support this argument.

■ ¶31 "The community caretaking function exception recognizes that a person may encounter police officers in situations involving . . . a routine check on health and safety." *State v. Kinzy*, 141 Wn.2d 373, 387, 5 P.3d 668 (2000). Whether an encounter on the basis of a community caretaking purpose is reasonable depends on a balancing of the individual's interest in freedom from police interference against the public's interest in the performance of the community caretaking function. *Id.* (quoting *Kalmas v. Wagner*, 133 Wn.2d 210, 216-17, 943 P.2d 1369 (1997)). If the person has been seized, balancing the two interests does not necessarily favor an encounter by police. *Id.* at 388. A court must cautiously apply the community caretaking exception because of the risk of abuse. *Id.* "Once the exception does apply, police officers may conduct a noncriminal investigation so long as it is necessary and strictly relevant to performance of the community caretaking function." *Id.*

■ ¶32 "[R]endering aid or assistance through a health and safety check is a hallmark of the community caretaking function exception." *Id.* at 389. It is in the public interest to allow police officers to approach citizens and permissively inquire whether they will answer questions. *Id.* at 388. When considering the applicability of the community caretaking provision, the proper inquiry is "whether totality of the circumstances indicate 'a reasonable person would have felt free to leave or otherwise decline the officer's requests and terminate the encounter.' " *Id.* (quoting *State v. Thorn*, 129 Wn.2d 347, 352, 917 P.2d 108 (1996), *overruled on other grounds by O'Neill*, 148 Wn.2d 564).

■ ¶33 There is no objective evidence demonstrating that Officer Valencia was performing a community caretaking function when he stopped Mr. Gantt. Officer Valencia pulled behind Mr. Gantt's vehicle and activated his emergency lights even though the officer had not seen a traffic infraction or any criminal activity. Officer Valencia asked Mr. Gantt what he was doing there. The officer did not ask whether Mr. Gantt was lost or needed assistance or

whether he would answer questions. Instead, Officer Valencia activated his emergency lights because he saw the van parked at two different locations and because he observed Mr. Gantt walking to a nearby residence.

¶34 *Reasonableness.* Assuming Mr. Gantt was seized, the next question is whether the seizure of Mr. Gantt was reasonable. If a contact constitutes a seizure, that seizure is reasonable only if the officer had an objectively reasonable suspicion that the person was involved in criminal activity. *DeArman*, 54 Wn. App. at 624 (quoting *State v. Larson*, 93 Wn.2d 638, 644, 611 P.2d 771 (1980)). At the time Officer Valencia activated his emergency lights, he had no reason to suspect that Mr. Gantt was involved in criminal activity. The seizure was unreasonable.

¶35 *Suppression.* Mr. Gantt asserts that all of the evidence seized from the van must be suppressed.

¶36 If a person is seized in violation of the Fourth Amendment or article I, section 7, the evidence subsequently obtained must be suppressed under the exclusionary rule. *Harrington*, 167 Wn.2d at 664. Officer Valencia unlawfully seized Mr. Gantt by activating the patrol car's emergency lights. The evidence discovered as a result of this seizure must be suppressed including the "open view" evidence discovered by Officer Brumley. *See State v. Jesson*, 142 Wn. App. 852, 858, 177 P.3d 139 (2008). "Under the open view doctrine, when an officer is lawfully present in an area, his detection of items by using one or more of his senses does not constitute a search within the meaning of the Fourth Amendment." *Id.* Officer Brumley was present only because Officer Valencia had unlawfully seized Mr. Gantt.

¶37 Because we conclude that Mr. Gantt was unlawfully seized, we need not reach his additional assertions of error.

¶38 We reverse the denial of the suppression motion and the convictions.

SIDDOWAY, J., concurs.

¶39 KORSMO, J. (dissenting) — Eric Gantt failed to develop the record to support the majority's view of the facts. He also did not establish that he was seized before the officers had cause to do so. Because the trial court correctly determined there was no seizure until after the falsified trip permit was discovered, the convictions should be affirmed.

¶40 *Record Development.* The initial problem with this case comes from the inadequately developed record. The majority refers to Officer Tony Valencia's "emergency lights" having been turned on when he pulled up behind the improperly[2] parked van. There is no evidence to support that assertion.

¶41 None of the police reports that were filed as the record for the suppression hearing make mention of *any* lights being turned on. Clerk's Papers at 39-44. Instead, information about the lights became part of the record by agreement of counsel. Both counsel stipulated that the officer "activated his lights" when he parked behind the van. Report of Proceedings at 4. The problem with this stipulation is that police officers typically have several combinations of lights that can be displayed. Defense counsel in argument repeatedly referred to the activation of the officer's "emergency lights" as the moment of seizure. While that may be an accurate description of which lights were used, it is not a foregone conclusion, and it is beyond what the parties stipulated. The officer may well have activated simply his yellow "wig-wag" lights to alert traffic to his presence, or he may have displayed lights other than the

---

[2] The agreed-upon facts establish that Mr. Gantt's van was parked in front of the driveway.

"emergency lights" typically used in a traffic stop. This is particularly the case where, as here, the officer's stated subjective reason for the encounter was to engage in a "social contact" to investigate the defendant's presence in the neighborhood. He did not believe he was seizing Mr. Gantt and may well have refrained from using the emergency lights. We should not assume that he did.[3]

¶42 It was Mr. Gantt's burden to establish that he was seized. *State v. Thorn*, 129 Wn.2d 347, 354, 917 P.2d 108 (1996), *overruled on other grounds by State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Because he did not establish that the officer used the emergency lights, his own theory of seizure, now adopted by the majority, is without support in the record.

¶43 This case is similar to *Thorn* in several respects. There, like here, a suppression hearing was held on the basis of the police reports. *Id.* at 349. Like this case, the dispositive issue in *Thorn* was when the defendant was seized. *Id.* at 350. The Supreme Court ruled that the written record did not provide an adequate basis for answering that question because, with a stipulated record, "the encounter is capable of varying intepretations." *Id.* at 353. Given that situation, the court reversed the trial court's suppression order. *Id.* at 354. We should do the same here.

¶44 The defendant did not prove the factual basis for his theory that he was seized when the officer parked behind his already parked van. We should decline to speculate about the facts. Instead, we should agree with the trial court's factual and legal determinations that Mr. Gantt was

---

[3] The trial court repeatedly referenced the officer's "lights" and did not use the term "emergency lights." This is a case that would have benefited from entry of the appropriate findings required by CrR 3.6. Where an evidentiary hearing is not held, the trial court is required to enter a written order explaining why. CrR 3.6(a). Where an evidentiary hearing is held, the trial court is required to enter findings of fact and conclusions of law. CrR 3.6(b). In either circumstance, regardless of which side prevails, the defendant's trial counsel has a significant incentive to make sure that the findings are entered because it is the defense's burden to show that a warrantless seizure occurred.

not seized until discovery of the invalid trip permit. That evidence provided probable cause to arrest for a gross-misdemeanor offense committed in the officer's presence. Former RCW 46.16.160 (2007).[4]

¶45 Mr. Gantt did not establish that he was seized before probable cause to arrest had been discovered. On that basis alone, we should affirm. *Thorn*, 129 Wn.2d at 354.

¶46 *Timing of Seizure.* Even if we assume that Officer Valencia used his "emergency lights" upon parking his patrol car, the record does not establish that Mr. Gantt was seized before the discovery of the invalid trip permit. A "show of authority" directed against a parked car does not seize a pedestrian standing near a house.

¶47 Because searches and seizures disturb private affairs, article I, section 7[5] protections apply where an individual is seized. *State v. Harrington*, 167 Wn.2d 656, 663, 222 P.3d 92 (2009). A seizure occurs when, under the totality of the circumstances, an individual's freedom of movement is restrained, and that person would not feel free to leave or decline a request due to a police officer's use of force or display of authority. *State v. Rankin*, 151 Wn.2d 689, 695, 92 P.3d 202 (2004). Generally, no seizure occurs where a police officer merely asks an individual whether he or she will answer questions or when the officer makes some further request that falls short of immobilizing the individual. *State v. Nettles*, 70 Wn. App. 706, 710, 855 P.2d 699 (1993). This is an objective standard; therefore the subjective intent of the officer is irrelevant to the determination of whether a seizure occurred. *State v. Young*, 135 Wn.2d 498, 501, 957 P.2d 681 (1998). The defendant bears the burden of demonstrating a seizure. *Id.* at 510; *Thorn*, 129 Wn.2d at 354.

---

[4] Now codified at RCW 46.16A.320.

[5] "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7.

¶48 The majority begins its analysis with a discussion of whether the police cruiser's emergency lights constituted a sufficient show of authority to render Mr. Gantt seized. However, that analysis fails to take into consideration the context of the stop. This failure is critical since our inquiry must focus upon the *totality* of the circumstances. *Rankin*, 151 Wn.2d at 695. When viewed properly, the context of the contact makes clear that the majority's reliance upon *Young, State v. DeArman*, 54 Wn. App. 621, 774 P.2d 1247 (1989), and *State v. Stroud*, 30 Wn. App. 392, 634 P.2d 316 (1981), is misplaced, and that Mr. Gantt has failed to meet his burden to demonstrate a seizure.

¶49 It is rather axiomatic that, in the seizure context, there is a significant distinction to be drawn from the occupant of a moving vehicle and a pedestrian. *O'Neill*, 148 Wn.2d at 579. The distinction is removed once the vehicle is parked: "where a vehicle is parked in a public place, the distinction between a pedestrian and the occupant of a vehicle dissipates." *Id.* Here, there is no question that Mr. Gantt's van was parked, and that he was away from it when Officer Valencia arrived. Thus, the proper way to view this case is by regarding it as a pedestrian stop. *Id.*

¶50 Since we must view the case as a pedestrian stop, any reliance upon *DeArman* is not apropos since that case involved a motor vehicle stop. The distinction is not only required by our case law, but necessary, since an individual driving a motor vehicle is required to submit to a police officer where the officer signals that individual to pull over. RCW 46.61.020(1).[6] "A pedestrian, however, who notices a patrol wagon's emergency equipment ordinarily is not likely to know that an officer is signaling for a stop until the officer communicates in a more direct manner to the pedestrian the officer's intention to stop the pedestrian."

---

[6] "It is unlawful for any person while operating or in charge of any vehicle . . . to refuse or neglect to stop when signaled to stop by any police officer." *Accord* RCW 46.61.021(1) ("Any person requested or signaled to stop by a law enforcement officer for a traffic infraction has a duty to stop.").

*Lawrence v. United States,* 509 A.2d 614, 616 n.2 (D.C. 1986). The reasoning behind this distinction is clear. Emergency lights have many functions—they may serve to inform motorists that they need to move to the side of the road to permit an emergency vehicle to freely pass, they may serve to initiate a traffic stop, or they may also serve to simply announce an officer's presence on the side of the road for officer safety purposes. They may even serve to light up a dark area by casting their light about in a more efficient manner than a spotlight. *See Young,* 135 Wn.2d at 503. Accordingly, while the reasonable car driver understands to pull over when he or she sees flashing lights—either to allow the officer to pass or to submit to a traffic stop—the reasonable pedestrian does not know the specific purpose of the lights and would not consider himself or herself seized without something further to indicate that he or she is not free to leave.

¶51 When viewed in this manner, the majority's reliance upon *Young* and *Stroud* fails to persuade. *Young* stands for the proposition that where a uniformed officer "spotlights" a pedestrian and asks him questions, there was an insufficient show of authority to constitute a seizure. *Young,* 135 Wn.2d at 513-514. In *Stroud,* the officer pulled behind an occupied parked car, activated his emergency lights, and turned on his high beam headlights. *Stroud,* 30 Wn. App. at 393. The court held that the driver was seized at that point. *Id.* at 396. In adopting these cases, the majority analysis misses a crucial distinction to be drawn between *Stroud* and *Young* and this case. In *Young,* the spotlight was pointed directly at the defendant. In *Stroud,* the defendant was a passenger in a parked car when the officer pulled directly behind the vehicle and activated emergency lights and high beam headlights. In each case, *the show of authority was unmistakably directed at the defendant,* though of course the resulting outcome differed.

¶52 In contrast here Officer Valencia pulled his cruiser in behind Mr. Gantt's car, which was parked next to the

street in front of a house's driveway. Mr. Gantt himself was out of the car and near the house when the officer arrived. A reasonable person would not believe he or she had been seized because he or she does not know for what purpose the lights have been activated. *Lawrence*, 509 A.2d at 616 n.2. This case is therefore distinguishable from *Stroud* and *Young*, since the show of authority (the lights) were not unmistakably directed at Mr. Gantt, but at the parked car. The lights could have been activated to alert other vehicles of the car's presence, to announce that the officer was present given the darkness, or simply to light the scene more efficiently than with a spotlight. Given the limited record, we do not even know which lights were activated or even why they were activated, and Mr. Gantt has offered no evidence to suggest that the lights were a sufficient show of authority to effectuate a seizure.

¶53 Nor does Officer Valencia's questioning, even in conjunction with the emergency lights, constitute a seizure. It is well established that a uniformed police officer who is armed does not seize a citizen by merely approaching that individual on the street or in another public place, or by engaging him or her in conversation. *State v. Belanger*, 36 Wn. App. 818, 820, 677 P.2d 781 (1984). Such encounters are known as a so-called "social contact."

¶54 In its briefing, the State relied upon *Harrington* to support its argument that Officer Valencia was conducting a social contact. The majority analysis distinguishes *Harrington* by citing it for the proposition that a social contact between an officer and a citizen " 'does not suggest an investigative component.' " Majority at 142 (quoting *Harrington*, 167 Wn.2d at 664). The majority then finds that since Officer Valencia asked Mr. Gantt what he was doing, an investigative element was present; therefore the conversation was not a social contact. However, this conclusion stems from a faulty reading of *Harrington* and serves only to alleviate Mr. Gantt's burden upon appeal.

¶55 The *Harrington* court noted that the plain meaning of the phrase "social contact" does not suggest an investi-

gative component. *Harrington*, 167 Wn.2d at 664. It went on to note, however, that the actual application of a "social contact" in the field and before the court is different in that investigative questioning such as requesting identification is necessarily permitted. *Id.* at 664-665. The *Harrington* court went on to further define the contours of a social stop in Washington by holding that even where separate actions may pass constitutional muster, those actions, when viewed cumulatively, may constitute a progressive intrusion into an individual's privacy to the point that a social contact becomes a seizure. *Id.* at 669-670.

¶56 Here, Officer Valencia engaged Mr. Gantt in conversation by asking him what he was doing there. It is clear that the question itself would not constitute a stop, since the officer is free to make that inquiry.[7] However, the officer's tone may have been enough to effectuate a seizure if it were demanding, confrontational, or indicated in some fashion that Mr. Gantt was not free to refuse an answer, or simply get in his car and drive away. *See Thorn*, 129 Wn.2d at 353-354. Unfortunately, one of the problems with cases such as this is that there is a dearth of facts indicating the manner in which the question was asked. *Id.* The record does not make this clear, and it is Mr. Gantt's burden on appeal to demonstrate that the question or the manner in which it was asked was coercive *Id.* at 354. He has failed to do this, and as such, the record before us indicates nothing coercive about Officer Valencia's question.

¶57 In sum, there was nothing coercive about Officer Valencia's emergency lights, since they were not directed at Mr. Gantt. There was nothing coercive about the questioning. Each taken individually passes constitutional muster. Even when taken together, the officer's actions did not constitute an intrusion upon Mr. Gantt's privacy such that a reasonable pedestrian in his position would not have felt

---

[7] We previously have found that asking a citizen what he or she is doing does not rise to the level of a seizure. *See State v. Ellwood*, 52 Wn. App. 70, 757 P.2d 547 (1988).

free to either refuse to answer Officer's Valencia's question or simply get in his car and drive away. Mr. Gantt has failed to demonstrate he was seized.

¶58 Officer Valencia's decision to turn on his vehicle's lights when he parked his patrol car at 10:00 p.m. on a spring evening is too ambiguous to amount to a seizure. The trial court properly focused on the consequences of a contrary ruling. Is a disabled car seized when an officer stops to give aid and turns on the emergency lights? Is every car on a highway seized when an officer races to an accident site with emergency lights activated? Presumably the majority would answer "no" to both questions, but the answer would be inconsistent with its declaration that Officer Valencia seized Mr. Gantt at the time he activated his emergency lights. Majority at 144.

¶59 The veteran trial judge correctly observed that the officer engaged in good police work when he suspected Mr. Gantt of "casing" the neighborhood for houses to burglarize. It would have been a dereliction of duty not to investigate what the van's occupants were up to. The van clearly was not visiting the residence; it was parked in front of the driveway and one of the occupants was in the passenger seat. Why the van kept stopping in the area was a worthy topic of investigation.

¶60 The emergency lights were not directed at Mr. Gantt and were not sufficient to constitute a seizure. There simply is too much ambiguity in this fact pattern to conclude that a seizure occurred before probable cause existed.

¶61 Mr. Gantt has not established his claim that the "emergency lights" were activated or that he was seized before probable cause existed for arrest. The trial court should be affirmed. I respectfully dissent.