[No. 54338-5-I.   Division One.   August 29, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. CURTIS EUGENE MOTE, *Appellant*.

278

*Christopher Gibson* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *David M. Seaver, Deputy*, for respondent.

¶1 APPELWICK, J. — A police officer pulled his patrol car up behind an occupied car that was legally parked on a residential street with its tail and dome lights on. He walked up to the driver's side window and requested identifying information from both occupants, who complied. A warrant check revealed that Curtis Mote, who was in the front passenger seat, had an outstanding warrant. The officer arrested and searched Mote, and found a small baggie of methamphetamine. Mote moved to suppress the evidence on the ground that he was illegally seized when the officer asked for his identification. The trial court denied his motion and held that Mote was not seized until he was arrested. Mote was subsequently convicted of possession of methamphetamine and appeals. We affirm.

## FACTS

¶2 At about 11:45 P.M. on June 14, 2003, King County Sheriff's Office Deputy Steve Cox was patrolling the White Center neighborhood, which was experiencing drug activity problems. Cox was wearing a standard police uniform. He wore his badge and gun belt, which held his gun and handcuffs. He was driving a marked police vehicle that had push bumpers, official markings, an overhead red, white, and blue light bar, and two spotlights, one on each side.

¶3 Near an intersection, Cox drove by a legally parked car. There were two people seated inside, and the car's rear

and dome lights were on.[1] Concerned about drug activity and frequent vehicle prowls in the area, Cox turned his police car around and parked behind the other vehicle. He testified that the fact that it was late at night in a residential area with no traffic or people around made two people in a car with tail and dome lights on stand out.

¶4 Cox had not pulled the car over for a traffic infraction or noticed any expired tabs or other infraction. Mote testified that he and the driver had entered the car just "two seconds" before Cox pulled up behind them, and the car was still parked. Although Cox agreed that the situation was not consistent with criminal activity, Cox found criminal activity about half the time in such circumstances, so he had a "hunch" and was suspicious. Making a social contact in such circumstances was routine practice for Cox.

¶5 Cox had his headlights on, but not his overhead lights. Mote testified that he was certain that the spotlight was on the car when Cox drove up, although Cox was not sure about this. Cox approached the driver's side of the car and asked the occupants "what they were up to." He noticed that they seemed nervous and startled by his presence. Cox testified that, at that point, the contact was merely social and the occupants were free to go, because he had no "*Terry* stop material"[2] or reason to stop them.

¶6 Cox asked the driver for his identification, and the driver gave Cox his license. Cox wrote down his name. Cox then asked Mote "What is your name and date of birth?" Mote gave Cox this information, which Cox also wrote down. Cox testified that he spoke to the occupants politely and respectfully, that the encounter was fairly casual, that he was not being hostile, and that he did not demand any information. Mote agreed that Cox did not demand but only asked him for the identifying information. The court found

---

[1] The court found that the dome light was on. Mote does not challenge this factual finding, and it is therefore a verity on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

that Cox was not harsh and did not suggest that Mote or the driver were under arrest or in custody.

¶7 Cox did not tell Mote that he did not have to answer the question or that he was free to leave and not under arrest. Mote knew Cox was a policeman because of his police car, his uniform, and the spotlight. Mote knew there was a warrant out for his arrest and that he would be arrested after Cox found the warrant. Mote did not think he was free to leave when Cox approached the car, and did not consider opening the door and walking away. He thought it was general practice to give the police identifying information on request and that compliance was required. He had a prior contact with police during which he alleged he was beaten for failing to comply with a police request.

¶8 Cox returned to his patrol car to check the driver's driving status and both the occupants for warrants. Cox testified that prior to the check, the occupants were still free to leave and the contact remained social. While Cox was running the check, he noticed that the occupants were moving around in the car and became concerned that they were trying to hide drugs or a weapon. The warrant check disclosed Mote's outstanding warrant. After calling for backup, Cox went up to the passenger side, asked Mote to step out of the car, and arrested him on the outstanding warrant. Cox then searched Mote and found a plastic baggie in his pocket that had "a little bit" of white powder. At that point Mote said "Oh, I found it." The powder field tested positive for methamphetamine. Cox subsequently arrested Mote for possession in addition to the outstanding warrant and read Mote his *Miranda*[3] rights.

¶9 Mote moved to suppress the evidence seized during the search. He argued that he was unlawfully seized when Cox asked him for his name and birth date. The court held that Mote was free to leave and was seized only after Cox found the outstanding warrant. Mote was convicted as charged and appeals the trial court's denial of his suppression motion.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

ANALYSIS

¶10 Under the Washington Constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." CONST. art. I, § 7. It is well settled that article I, section 7 provides greater protection of a person's right to privacy than the Fourth Amendment. *State v. O'Neill*, 148 Wn.2d 564, 584, 62 P.3d 489 (2003); *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002). The right to be free of unreasonable governmental intrusion into an individual's private affairs encompasses automobiles. *O'Neill*, 148 Wn.2d at 584. The individual asserting a seizure in violation of article I, section 7 bears the burden of proving that there was a seizure. *State v. Young*, 135 Wn.2d 498, 510, 957 P.2d 681 (1998). Where the facts are undisputed, the determination of whether there is a violation of article I, section 7 is a question of law reviewed de novo. *State v. Rankin*, 151 Wn.2d 689, 694, 92 P.3d 202 (2004).

¶11 Not every encounter between a police officer and a private individual constitutes an official intrusion requiring objective justification. *United States v. Mendenhall*, 446 U.S. 544, 551-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). Article I, section 7 permits social contacts between police and citizens. *Young*, 135 Wn.2d at 511. An officer's mere social contact with an individual in a public place with a request for identifying information, without more, is not a seizure or an investigative detention. *Young*, 135 Wn.2d at 511; *Mendenhall*, 446 U.S. at 555; *State v. Armenta*, 134 Wn.2d 1, 11, 948 P.2d 1280 (1997). This is true even when the officer subjectively suspects the possibility of criminal activity but does not have suspicion justifying a *Terry* stop. *O'Neill*, 148 Wn.2d at 574-75. As part of their "community caretaking" function, police officers must be able to approach citizens and permissively inquire into whether they will answer questions. *State v. Nettles*, 70 Wn. App. 706, 712, 855 P.2d 699 (1993).

¶12 A seizure under article I, section 7 occurs only when an individual's freedom of movement is restrained

and the individual would not believe that she is free to leave, or decline a request, due to an officer's use of physical force or display of authority. *O'Neill*, 148 Wn.2d at 574. This determination is made by looking objectively at the actions of the law enforcement officer. *Young*, 135 Wn.2d at 501, 504-05, 510 (rejecting the mixed objective/subjective test adopted in *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), to determine whether a Fourth Amendment seizure occurred). The relevant question is whether a reasonable person in the individual's position would feel he or she was being detained. *O'Neill*, 148 Wn.2d at 581. "The reasonable person standard does not mean that when a uniformed law enforcement officer, with holstered weapon and official vehicle, approaches and asks questions, he has made such a show of authority as to rise to the level of a *Terry* stop." *O'Neill*, 148 Wn.2d at 581.

¶13 Examples of circumstances that might indicate a show of authority constituting a seizure would be:

> "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554-55). Absent such circumstances, inoffensive contact between the police and a private citizen cannot, as a matter of law, amount to a seizure of that person. *Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554-55).

¶14 Mote argues that under *Rankin*, he was seized in violation of article I, section 7 when Cox asked him for his name and date of birth. Because a warrantless seizure is per se unconstitutional unless it falls within one of the few exceptions to the warrant requirement, the first step is to determine whether there was a seizure. *Rankin*, 151 Wn.2d at 695. The next step would be to determine if a warrant exception justified the seizure. *Rankin*, 151 Wn.2d at 695. Here, the state argues that there was no seizure when Cox asked Mote for identifying information and does not argue that a warrant exception applies.

## I. The *Rankin* Decision

¶15 The *Rankin* decision addressed the consolidated appeals of James Rankin and Kevin Staab. Both Rankin and Staab were passengers in vehicles that were stopped by law enforcement. *Rankin*, 151 Wn.2d at 692-93. The Rankin vehicle was stopped for rolling over a marked stop line (a traffic offense), and the Staab vehicle was stopped for not having a license plate light (a traffic offense). *Rankin*, 151 Wn.2d at 692-93. Rankin and Staab were both asked for identification. *Rankin*, 151 Wn.2d at 692-93. Rankin provided identification, which the officer used to find an outstanding warrant and arrest Rankin. *Rankin*, 151 Wn.2d at 692. During the search incident to Rankin's arrest, the officer found methamphetamine on Rankin. *Rankin*, 151 Wn.2d at 692. Staab reached into his pocket to get his identification card, and a plastic bag containing a white chalky substance fell out. *Rankin*, 151 Wn.2d at 693. The officer found no outstanding warrant but arrested Staab based on his belief that the bag contained cocaine. *Rankin*, 151 Wn.2d at 693. Rankin and Staab both moved to suppress the seized evidence. The motion was granted in Rankin's case and denied in Staab's case. *Rankin*, 151 Wn.2d at 693. The State appealed the grant of Rankin's motion, and Staab appealed the denial of his motion. The appeals were consolidated. *Rankin*, 151 Wn.2d at 694.

¶16 An automobile passenger is not seized merely because an officer stops the vehicle she is riding in. *State v. Mendez*, 137 Wn.2d 208, 222, 970 P.2d 722 (1999). But, there is an unconstitutional seizure when an officer subsequently requests identification from the passenger without independent cause. *Rankin*, 151 Wn.2d at 695. Whether the officer demands or requests the identification is irrelevant. *Rankin*, 151 Wn.2d at 696-99. The *Rankin* court noted that its holding did not preclude an officer from engaging passengers in conversation. *Rankin*, 151 Wn.2d at 699-700.

¶17 The *Rankin* court relied heavily on *State v. Larson*, 93 Wn.2d 638, 611 P.2d 771 (1980). In *Larson*, two officers were patrolling a high-crime neighborhood very early in the

morning. *Larson*, 93 Wn.2d at 639. They noticed a car stopped on the street next to a park that was closed at that time of day. *Larson*, 93 Wn.2d at 639. The car was parked more than a foot from the curb (a parking violation). The officers thought it would be unusual for the car to be parked in that location if the occupants intended to visit the apartments across the street. *Larson*, 93 Wn.2d at 639. They decided to question the people in the car to find out what they were doing and why they were there. *Larson*, 93 Wn.2d at 639. The *Larson* court noted that as far as the officers knew, the car could have stopped only long enough to discharge a passenger or for another legitimate reason. *Larson*, 93 Wn.2d at 643. As the officers drove up behind the car, it started to pull away. The officers then flashed the blue emergency lights, and the car stopped. *Larson*, 93 Wn.2d at 640.

¶18 The officers approached and asked the occupants of the car, including the passengers, for identification. As one passenger, Larson, reached inside her purse for identification, an officer shone his flashlight into the purse, testifying he did so to make sure she was not reaching for a weapon. *Larson*, 93 Wn.2d at 640. In the purse, the officer saw a plastic bag that contained marijuana. *Larson*, 93 Wn.2d at 640. The officer arrested Larson for possession of marijuana, and a subsequent search yielded evidence of many additional crimes. *Larson*, 93 Wn.2d at 640. Larson moved to suppress all the evidence on the basis that there was a seizure that violated her Fourth Amendment rights. *Larson*, 93 Wn.2d at 640.

¶19 The *Larson* court assumed for its analysis that a parking violation would be a traffic offense such that it would be reasonable for an officer to stop a car and detain the driver to check her license and registration. *Larson*, 93 Wn.2d at 641-42. But, the court held that a stop based on such a violation was not grounds for an officer to require identification from a passenger in the car, unless there was independent cause to seek identification from the passenger. *Larson*, 93 Wn.2d at 642. Because there was no

independent cause to suspect Larson of criminal activity, the court held that her Fourth Amendment rights were violated when the officer detained her for the purpose of requiring her to identify herself. *Larson*, 93 Wn.2d at 645. The court held that this was also a violation of article I, section 7, although the opinion contained no separate state constitutional analysis in the opinion. *Larson*, 93 Wn.2d at 645.

## II. Passengers, Pedestrians, and Occupants of Cars Parked in Public Places

¶20 The State urges that Mote's situation is different from Rankin's or Staab's because Mote was an occupant of a car parked in a public place, while Rankin and Staab were passengers in moving cars stopped by the police. The State argues that occupants of parked cars, like Mote, should be treated like pedestrians, and not like passengers. Thus, the State argues that *Rankin* does not apply. And because asking for identification from a pedestrian does not constitute a seizure, *Young*, 135 Wn.2d at 511, the State contends that there was no seizure here.

¶21 The State cites to *State v. Thorn*, 129 Wn.2d 347, 917 P.2d 108 (1996), *overruled in part by State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). In *Thorn*, an officer saw a flicker of light in a legally parked car which he thought looked like an occupant lighting a pipe. *Thorn*, 129 Wn.2d at 349. The car was not in a high crime area and there was no indication of criminal activity or overt intoxication on the part of the car's occupants. *Thorn*, 129 Wn.2d at 349. The officer exited his patrol car, walked up to the person in the driver's seat, Thorn, and asked " 'Where is the pipe?' " *Thorn*, 129 Wn.2d at 349. In response, Thorn gave the officer a marijuana pipe. The officer arrested Thorn.[4] *Thorn*, 129 Wn.2d at 349. During a subsequent search the officer found a controlled substance on Thorn, and he was charged

---

[4] The court noted that Thorn was arrested for "possession of drug paraphernalia," which is not a crime. But, Thorn did not challenge his arrest on this basis. *Thorn*, 129 Wn.2d at 349 n.1.

with possession. *Thorn*, 129 Wn.2d at 349. The trial court suppressed the evidence and dismissed the case. *Thorn*, 129 Wn.2d at 350. The State appealed. *Thorn*, 129 Wn.2d at 350.

¶22 The *Thorn* court rejected the rationale that the fact that a person is in a parked car makes it more difficult for the person to leave than if the person was a pedestrian. *Thorn*, 129 Wn.2d at 352-53. The court approvingly cited *United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994), in which the Ninth Circuit stated that the distinction between stopping a pedestrian and stopping a person in a car dissipates when the car is parked in a public place. *Thorn*, 129 Wn.2d at 353. The *Thorn* court noted that the focus of a Fourth Amendment inquiry is on the officer's actions, not on whether the defendant was confined due to circumstances independent of police action (such as choosing to sit in a parked car). *Thorn*, 129 Wn.2d at 353 (citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)). And, the court noted that the question is not merely whether the person felt free to leave but whether he felt free to terminate the encounter, refuse to answer the question, or otherwise go about his business. *Thorn*, 129 Wn.2d at 353. Thus, the *Thorn* court held that "whether it was more difficult for the defendant to actually leave the scene of the police contact because he was in a parked car is not a significant factor here." *Thorn*, 129 Wn.2d at 353.

¶23 The court held that although an officer may in some circumstances seize a person by merely asking a question, that act does not per se constitute a seizure. *Thorn*, 129 Wn.2d at 354. Because the record did not establish that a reasonable person under the circumstances would feel that he was not free to terminate the encounter, refuse to answer the questions, or otherwise go about his business, the *Thorn* court reversed the order suppressing the evidence. *Thorn*, 129 Wn.2d at 353-54.

¶24 Mote argues that *Thorn* is not applicable here because it was decided under Fourth Amendment seizure principles and explicitly refused to reach the state consti-

tutional issue. *Thorn*, 129 Wn.2d at 352 n.3. But, the *O'Neill* court held that "where a vehicle is parked in a public place, the distinction between a pedestrian and the occupant of a vehicle dissipates."[5] *O'Neill*, 148 Wn.2d at 579 (citing *Thorn* and *State v. Knox*, 86 Wn. App. 831, 833, 939 P.2d 710 (1997), a similar case that cited both the Fourth Amendment and article I, section 7). The *O'Neill* court noted that *Thorn* was a Fourth Amendment case, but adopted its reasoning on this point for article I, section 7 analyses as well. *O'Neill*, 148 Wn.2d at 579.

¶25 In *O'Neill*, an officer approached a car parked in front of a closed store that had been burglarized twice in the past month. *O'Neill*, 148 Wn.2d at 571-72. He pulled up behind the car, activated his spotlight, and ran a computer check on the license plate. The car had been impounded within the last two months. *O'Neill*, 148 Wn.2d at 572. The officer noticed that the windows of the car were fogged up, which led him to believe someone was in the car and that it had been there long enough to fog up the windows. *O'Neill*, 148 Wn.2d at 572. He walked up to the driver's side door, shone his flashlight in the driver's face, and asked him to roll down the window. *O'Neill*, 148 Wn.2d at 572. After some discussion about what the driver was doing there, the officer asked him for identification. The driver, O'Neill, said he had no identification and his license had been revoked and gave the officer a name that turned out to be false. *O'Neill*, 148 Wn.2d at 572. The officer asked O'Neill to step out of the vehicle, and subsequent events led to O'Neill's arrest. *O'Neill*, 148 Wn.2d at 572-73.

---

[5] The Washington Supreme Court thus rejected the contrary view set out by the *O'Neill* dissent that a person in a parked car with the windows up is not in a public place. *State v. O'Neill*, 104 Wn. App. 850, 875, 17 P.3d 682 (2001) (Becker, A.C.J., dissenting) ("A person in a parked car with the windows up is not in a public place, and certainly that location is not the equivalent of standing outdoors on the street or at a truck stop."), *aff'd in part and rev'd in part*, 148 Wn.2d 564, 593, 62 P.3d 489 (2003). *See also* 4 WAYNE R. LAFAVE, SEARCH & SEIZURE § 9.3(a), at 96-98 (3d ed. 1996 & Supp. 2004) (collecting cases from federal and state jurisdictions and concluding that "if an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure" (footnotes omitted)).

¶26 The *O'Neill* court held that under article I, section 7, O'Neill was not seized prior to being asked to step out of the vehicle. *O'Neill*, 148 Wn.2d at 574, 581. The court "reject[ed] the premise that under article I, section 7 a police officer cannot question an individual or ask for identification because the officer subjectively suspects the possibility of criminal activity, but does not have a suspicion rising to the level to justify a *Terry* stop." *O'Neill*, 148 Wn.2d at 577. To determine if there was a seizure, the court looked to whether the officer had made any show of authority. *O'Neill*, 148 Wn.2d at 577. It noted that the officer made no demands and issued no orders and that shining a spotlight on the car did not constitute a seizure. *O'Neill*, 148 Wn.2d at 578. The court noted that because it is not improper for an officer to engage a citizen in conversation in a public place, the officer did not seize O'Neill by asking him to roll his window down. *O'Neill*, 148 Wn.2d at 579. The court concluded that when a vehicle is parked in a public place "the distinction between a pedestrian and the occupant of a vehicle dissipates." *O'Neill*, 148 Wn.2d at 579.

¶27 Thus under *O'Neill*, occupants of vehicles parked in public places should be treated like pedestrians for article I, section 7 purposes. The *Rankin* decision did not address persons seated in cars parked in public places, as the *O'Neill* decision did. Rather, in *Rankin*, the passengers were in vehicles stopped by law enforcement after a show of authority. Mote points out that the *Rankin* court specifically stated "[w]e think there are good reasons for making a distinction between pedestrians and passengers." *Rankin*, 151 Wn.2d at 697. But the *Rankin* court continued:

> As we have said, " 'many [individuals] find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel.' " *City of Seattle v. Mesiani*, 110 Wn.2d 454, 457, 755 P.2d 775 (1988) (quoting *Delaware v. Prouse*, 440 U.S. 648, 662, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)). Indeed, a passenger faced with undesirable questioning by the police does not have the realistic alternative of leaving the scene as does a pedes-

trian. As the noted commentator Professor LaFave observed, the passenger is forced to abandon his or her chosen mode of transportation and, instead, walk away into a frequently foreign location thereby risking the departure of his or her ride while away. *See* Wayne R. LaFave, *The Present and Future Fourth Amendment*, 1995 U. ILL. L. REV. 111, 114-15.

*Rankin*, 151 Wn.2d at 697 (alteration in original). The *Rankin* court's comments show that it focused on the different circumstances encountered by pedestrians and passengers in *moving* cars that were *stopped* by police.

### III. *Rankin* Does Not Apply Here and Mote Was Not Seized

¶28 Occupants in vehicles parked in public places are like pedestrians for purposes of article I, section 7 seizure analysis. As the *O'Neill* court held, the distinction between a pedestrian and the occupant of a vehicle dissipates when a vehicle is parked in a public place. *O'Neill*, 148 Wn.2d at 579. The reasoning of *Rankin* and similar cases is centered on the fact that a driver's traffic infraction gives an officer cause to pull a vehicle over and get the driver's, but not the passenger's, identification. *Rankin*, 151 Wn.2d at 695. This reasoning does not apply to distinguish occupants in cars parked in public places from pedestrians.

¶29 The broad statement in *Rankin* that passengers cannot be asked for identification absent independent cause does not reach occupants in cars parked in public places who happen not to be in the driver's seat. When an officer makes a social contact with occupants of a car parked in a public place, the officer has no *cause* to seek identification from either the driver *or* other occupants. It is irrelevant to the officer the position in which a particular occupant is seated. Rather the officer is seeking to talk with all the occupants and find out what is going on. The basis for making a social contact with occupants of a parked vehicle is the same basis for making a social contact with a pedestrian: that police officers may engage citizens in conversation in public places even when there is not enough suspicion to justify a *Terry* stop. *See Young*, 135 Wn.2d at

511; *Nettles*, 70 Wn. App. at 712. Such social contact is permitted under article I, section 7 and is not an investigative detention. It is likely for this reason that the *O'Neill* court used the term "occupant" rather than "driver" or "passenger" to describe persons in a parked vehicle. *See O'Neill*, 148 Wn.2d at 579.

¶30 The *Rankin* decision quotes extensively from *O'Neill*. Nowhere does *Rankin* express disapproval with *O'Neill*, let alone suggest *O'Neill* is being overruled. In each case a passenger in the vehicle was asked for identification. *O'Neill* found no constitutional violation; *Rankin* did. The distinction factually between the cases is that the *Rankin* vehicle was stopped while driving and the *O'Neill* vehicle was parked in a public place. The *O'Neill* decision itself pointed out this distinction. *O'Neill*, 148 Wn.2d at 580 n.4 (distinguishing *Larson* because in *Larson* the "request for a passenger's identification [was made] after the driver was lawfully stopped"). The *Rankin* decision relied heavily on *Larson*. Therefore, the *Rankin* court did not create a bright-line rule that no person sitting in a passenger seat in a car could be asked for personal identification under any circumstances. Rather, *Rankin* is limited to circumstances where the police have stopped a moving car by show of force with cause to detain and question the driver but without cause to detain and question the passengers. Thus *O'Neill*, not *Rankin*, applies here.

¶31 Under *O'Neill*, the article I, section 7 analysis used to determine when a pedestrian has been seized applies to determine whether an occupant in a parked vehicle (whether seated in the driver's or any other seat) has been seized. Looking objectively at the officer's actions, the court must determine whether an individual's freedom of movement is restrained and the individual would not believe that she is free to leave, or decline a request, due to an officer's use of physical force or display of authority. *O'Neill*, 148 Wn.2d at 574; *Young*, 135 Wn.2d at 501, 510-11. Examples of a show of authority include the following:

"the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."

*Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554-55). Without such circumstances, inoffensive contact between the police and a private citizen cannot amount to a seizure of that person as a matter of law. *Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554-55).

¶32 Here, Mote was not seized. Cox testified that he may have used a spotlight, and Mote testified that Cox definitely used a spotlight. "The shining of the spotlight . . . does not rise to the level of intrusiveness discussed in *Mendenhall*." *Young*, 135 Wn.2d at 512-13. Therefore, even if we assume Cox did use a spotlight,[6] that fact alone would not constitute a per se violation of article I, section 7. *Young*, 135 Wn.2d at 513-14. Cox did not turn on his siren or overhead lights. He did not display his weapon or make any physical contact with Mote, and he was alone.[7] Mote was in a car parked in a public place, and an "occupant of a car does not have the same expectation of privacy in a vehicle parked in a public place as he or she might have in a vehicle in a private location—he or she is visible and accessible to anyone approaching." *O'Neill*, 148 Wn.2d at 579. And, as both Cox and Mote testified, Cox requested and did not demand Mote's identification. Thus his use of language and tone of voice did not change this encounter from a social contact into a seizure. Cox's actions in their entirety, viewed objectively, did not create such a show of authority that there would be a seizure. *See O'Neill*, 148 Wn.2d at 578-81 (finding no show of authority to constitute a seizure in similar circumstances as to person in driver's seat of parked vehicle). Mote's subjective understanding of the situation is

---

[6] Neither the trial court's written findings or oral ruling determine whether or not Cox used a spotlight.

[7] Although other officers arrived as backup, Cox was alone when he first approached the vehicle and asked for Mote's identification.

not relevant in determining whether or not there was a seizure.

¶33 We affirm.

Cox, C.J., and Ellington, J., concur.