# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                            )
             Respondent, )
                            )
             v. )
                            )
TAMARA MARIE LARSON, )
                            )
             Appellant. )

DIVISION ONE

No. 74766-5-I

UNPUBLISHED OPINION

FILED: May 1, 2017

DWYER, J. — Following a bench trial, Tamara Larson was found guilty of unlawful possession of a controlled substance with intent to deliver. On appeal, Larson contends that the trial court erred by denying her motion to suppress evidence of the drugs seized from her vehicle. Finding no error, we affirm.

I

Around midnight on July 23, 2015, Bellingham police officers Joshua Danke and Jay Hart drove into the parking lot of a 7-Eleven store located in a high drug-crime area. Detective Danke and Sergeant Hart occupied an unmarked police sports utility vehicle and were each wearing plain clothes underneath a vest marked "police." Upon entering the parking lot, Detective Danke noticed Danielle Coakley—whom Detective Danke recognized as a drug addict—standing with a friend. Detective Danke watched Coakley walk across the parking lot and enter a vehicle that was parked on the opposite side of the lot. Detective Danke and Sergeant Hart conducted a computer check of the vehicle's

license plate number and discovered that the vehicle belonged to Larson, who had been referenced in a recent drug report.

Detective Danke recognized the situation playing out in the parking lot and believed that a drug-buy was happening. Detective Danke and Sergeant Hart approached Larson's vehicle and Detective Danke shined his flashlight on Coakley, who appeared to be rummaging through her purse as Detective Danke approached. Detective Danke could see little plastic bags inside of Coakley's purse. Without prompting, Coakley exited the vehicle and began speaking with Detective Danke.

Detective Danke had spoken with Coakley on several prior occasions and the two had establish a rapport. During the course of their interaction, Coakley consented to a search of her purse. Detective Danke discovered drug paraphernalia in the purse and asked Coakley who was dealing. Coakley nodded over her shoulder to indicate Larson. Coakley told Detective Danke that she was in the car to buy drugs from Larson. Coakley asked Detective Danke if she was free to leave and Detective Danke replied that she was.

As Detective Danke was questioning Coakley, Sergeant Hart approached the driver's-side door of the vehicle to speak with Larson. Although Sergeant Hart could not hear the conversation between Detective Danke and Coakley, he wanted to question Larson away from Detective Danke and Coakley in order to prevent Larson from overhearing their conversation and using that information to explain why the two were in the car together. Sergeant Hart asked Larson if she would exit the car to speak with him. Sergeant Hart later testified that his

interaction with Larson was calm and cordial—he did not raise his voice or touch her throughout the encounter.

After Larson exited the vehicle and the two moved a few feet, Sergeant Hart asked her what she was doing in the area and where she was going. Larson replied that she was in the parking lot to purchase candy from the 7-Eleven and that she was on her way to Custer to pick up her son from her brother's house. Larson stated that she happened to see her friend, Coakley, while in the 7-Eleven.

To Sergeant Hart, Larson's answers to his questions were not logical. The 7-Eleven was far away from the freeway and there would have been other convenience stores open at that time that were closer to the freeway. Sergeant Hart then asked Larson if she was using drugs, to which Larson replied that she had been clean for a couple of years.

Sergeant Hart then asked Larson if she would consent to a search of the vehicle. Larson replied that she knew her rights, knew that she did not have to consent, and refused to allow the search. Sergeant Hart asked Larson what would happen if he brought a drug dog to sniff around the vehicle. Larson replied that she did not know what other people may have brought into the vehicle. Sergeant Hart and Larson then discussed the possibility of Larson becoming an informant for the police. Sergeant Hart informed Larson that, regardless of what she decided, she would not be going to jail that night.

Near the end of the conversation, Detective Danke informed Sergeant Hart that Coakley had admitted that there were drugs inside the vehicle.

Although the officers did not convey this information to Larson, she nevertheless admitted that there were drugs in the car. Larson was apprehensive about grabbing the drugs from inside the vehicle herself because a large group of people had gathered to watch her interaction with the police and she did not want to appear to be cooperating. Sergeant Hart and Detective Danke asked Larson if she was giving them consent to search the vehicle themselves. She confirmed that she was giving consent. After Detective Danke retrieved the drugs from the vehicle, Larson admitted that she was in the parking lot to sell drugs to Coakley. Sergeant Hart and Detective Danke allowed Larson to leave.

Prior to trial, Larson moved to suppress the evidence of the drugs seized from her vehicle. Larson argued that she had been unlawfully seized and thus her subsequent consent to a search of the vehicle was void. The trial court denied the motion. Larson was found guilty of unlawful possession of a controlled substance with intent to deliver. She timely appeals.

II

In the trial court, Larson argued that she was illegally seized as the result of a progressive series of intrusions. The trial court denied her motion.

Larson's argument changes on appeal. She now variously argues that, "Larson was seized when Sergeant Hart Asked Her to Step Out of the Vehicle,"[1] that "Hart had Larson exit her car and walk away from it"[2] and that "It was at this moment Larson was seized,"[3] or that she was seized when she was asked "to

---

[1] Br. of Appellant at 14.
[2] Br. of Appellant at 17.
[3] Br. of Appellant at 17.

- 4 -

exit her car, walk away from the car and answer questions about drug use."[4] Because these varying assertions differ from the approach that Larson litigated in the trial court, the court's findings of fact are not tailored to address these claims. However, given that the trial court found the testimony of both Sergeant Hart and Detective Danke to be credible, we have an adequate record to allow us to resolve Larson's present claims.

Although the evidence against her was garnered as the result of a consensual search, Larson contends that her consent was vitiated by her prior unlawful seizure. As a result, she avers, the search was unlawful—notwithstanding her consent—and the trial court erred by denying her motion to suppress.

To resolve this claim, we must determine whether Larson was, as she claims, unlawfully seized either when she was asked to exit her car, when she was asked to step several feet away from her car, or when the officer subsequently began talking with her about drugs. "Whether police have seized a person is a mixed question of law and fact." State v. Harrington, 167 Wn.2d 656, 662, 222 P.3d 92 (2009). "The rule in Washington is that challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal." State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003).

> Under article I, section 7, a person is seized "'only when, by means of physical force or a show of authority,' "his or her freedom of movement is restrained and a reasonable person would not have believed he or she is (1) free to leave, given all the circumstances,

---

[4] Br. of Appellant at 1.

> State v. Young, 135 Wn.2d 498, 510, 957 P.2d 681 (1998) (quoting State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) and citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)), or (2) free to otherwise decline an officer's request and terminate the encounter, see Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); [State v.] Thorn, 129 Wn.2d [347,] 352[, 917 P.2d 108 (1996), overruled on other grounds by State v. O'Neill, 148 Wn.2d at 571]. The standard is [ ] "a purely *objective* one, looking to the actions of the law enforcement officer." Young, 135 Wn.2d at 501 (emphasis added).

O'Neill, 148 Wn.2d at 574. "[T]he 'reasonable person' test presupposes an *innocent* person." Bostick, 501 U.S. at 438.

The defendant "bears the burden of proving a seizure occurred in violation of article I, section 7." Harrington, 167 Wn.2d at 664; accord O'Neill, 148 Wn.2d at 574. As the United States Supreme Court observed:

> Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business," California v. Hodari D., 499 U.S. 621, 628[, 111 S. Ct. 1547, 113 L. Ed. 2d 690] (1991), the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature. The Court made precisely this point in Terry v. Ohio, 392 U.S. 1, 19, n. 16[, 88 S. Ct. 1868, 20 L. Ed. 2d 889] (1968): "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

Bostick, 501 U.S. at 434.

> Previous Washington cases adopted the Mendenhall test of a seizure to analyze a disturbance of a person's private affairs under article I, section 7:
>
> > A person is "seized" within the meaning of the Fourth Amendment only when, by means of physical force or a show of authority, his freedom of movement is restrained. . . .

> There is a "seizure" when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.
>
> State v. Stroud, 30 Wn. App. 392, 394-95, 634 P.2d 316 (1981) (footnote omitted) (citing United States Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L.Ed.2d 497 (1980); accord State v. Thorn, 129 Wn.2d 347, 351–52, 917 P.2d 108 (1996).
>
> Washington search and seizure law stemming from Terry and proceeding through Mendenhall is well-established.

Young, 135 Wn.2d at 509-10.

In Young, our Supreme Court confirmed that Mendenhall's approach to Fourth Amendment "seizure" analysis remains applicable to article I, section 7 "seizure" analysis.

> "Examples of circumstance that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person."

Young, 135 Wn.2d at 512 (citations omitted) (quoting Mendenhall, 446 U.S. at 554-55). Our Supreme Court continues to apply the Mendenhall formulation to state constitutional seizure analysis, see, e.g., Harrington, 167 Wn.2d at 664; State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004); O'Neill, 148 Wn.2d at 574, as does this court. See, e.g., State v. Mote, 129 Wn. App. 276, 282-83, 120 P.3d 596 (2005).

"'[N]ot every encounter between a police officer and a citizen is an intrusion requiring an objective justification.'" Rankin, 151 Wn.2d at 695

(alteration in original) (quoting Mendenhall, 446 U.S. at 553). Thus, "the police are permitted to engage persons in conversation and ask for identification even in the absence of an articulable suspicion of wrongdoing." Young, 135 Wn.2d at 511. Moreover, "[w]hile most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." INS v. Delgado, 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984).

Seizure analysis under the federal and state constitutions differs in only one pertinent respect. By way of explanation, we note that, "[i]n Young, Washington adopted the test for Fourth Amendment 'seizure' in United States v. Mendenhall, as the test for seizure analysis under Washington Constitution article I, section 7." Rankin, 151 Wn.2d at 710 (Ireland, J., dissenting) (citations omitted). However, after Mendenhall, the United States Supreme Court held that a seizure for purposes of the Fourth Amendment can occur only where the subject actually yields to an officer's physical force or show of authority. Hodari D., 499 U.S. at 626-28. Later, our Supreme Court rejected the application of this test to article I, section 7 seizure analysis, instead applying a purely objective standard, Young, 135 Wn.2d at 509-11, which focuses not on whether the subject perceived that he or she was being ordered to restrict his or her movement but, rather, on whether the officer's words and actions would have conveyed that meaning to a reasonable person. Young, 135 Wn.2d at 506. Thus, cases applying the Fourth Amendment seizure analysis continue to be

applicable to an article I, section 7 analysis, so long as they do not involve an application of the Hodari D. "subjectivity" test.

There are, of course, a plethora of cases from both the United States Supreme Court and the Washington Supreme Court analyzing claims of unlawful seizures. Unsurprisingly, given the posture and facts of this case, several bear particular mention.

Florida v. Bostick, the case in which the United States Supreme Court made clear that the "reasonable person" referenced in constitutional seizure analysis is an "innocent person,"[5] 501 U.S. at 438, is one such case. In that case, two uniformed, armed police officers boarded a bus at a scheduled stop. In the admitted absence of articulable suspicion of wrongdoing, one officer asked to see Bostick's ticket and identification. Bostick complied. The officer then requested permission to search Bostick's luggage for drugs. He consented. Cocaine was found in the search, and Bostick was arrested and charged with trafficking in cocaine. 501 U.S. at 431-32.

Bostick challenged the fruits of the consensual search as being the product of an illegal seizure. In analyzing this claim, Justice O'Connor began her opinion for the Court with this observation:

> We have held that the Fourth Amendment permits police officers to approach individuals at random in airport lobbies and other public places to ask them questions and to request consent to search their luggage, so long as a reasonable person would understand that he or she could refuse to cooperate.

---

[5] Thus making clear that constitutional seizure analysis does not involve an application of a "reasonable criminal" standard. We do not objectively view an officer's words and conduct in an effort to determine whether a "reasonable criminal" would have felt free to leave or decline the officer's request.

Bostick, 501 U.S. at 431. Justice O'Connor further explained:

> There is no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure. The Court has dealt with similar encounters in airports and has found them to be "the sort of consensual encounter[s] that implicat[e] no Fourth Amendment interest." Florida v. Rodriguez, 469 U.S. 1, 5-6[, 105 S. Ct. 308, 83 L. Ed. 2d 165] (1984). We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, see INS v. Delgado, 466 U.S. 210, 216 (1984); Rodriguez, supra, at 5-6; ask to examine the individual's identification, see Delgado, supra, at 216; [Florida v. ]Royer, [460 U.S. 491] at 501, [103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)] (plurality opinion); United States v. Mendenhall, 446 U.S. 544, 557-558 (1980); and request consent to search his or her luggage, see Royer, supra, at 501 (plurality opinion)—as long as the police do not convey a message that compliance with their requests is required.

Bostick, 501 U.S. at 434-35.

Notwithstanding the weight of this authority, Bostick argued that he had been illegally seized.

> Bostick maintains that a reasonable bus passenger would not have felt free to leave under the circumstances of this case because there is nowhere to go on a bus. Also, the bus was about to depart. Had Bostick disembarked, he would have risked being stranded and losing whatever baggage he had locked away in the luggage compartment.

Bostick, 501 U.S. at 435. The Florida Supreme Court accepted this argument, holding that such encounters on a bus would always constitute a seizure because no reasonable person would feel free to leave the bus in such a situation. Bostick, 501 U.S. at 435.

The United States Supreme Court reversed, holding that the Florida court erred by elevating one fact—presence on a bus—to primacy instead of applying a totality of the circumstances analysis. Bostick, 501 U.S. at 437. The true

- 10 -

question, the Court noted, was not merely whether Bostick felt that he was "free to leave"—indeed, as a passenger on a bus scheduled to depart, Bostick would not have felt free to leave the bus even if the police had not been present—but, rather, "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 436. In other words,

> the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."

Bostick, 501 U.S. at 437 (quoting Michigan v. Chesternut, 486 U.S. 567, 569, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988).

Larson was the occupant of an automobile parked in a public place. A similar situation underlay the State Supreme Court's decision in State v. Thorn, 129 Wn.2d 347.[6] According to the opinion:

> While on routine patrol in a marked patrol car shortly after midnight, Spokane Police Officer K. Peden observed three people seated in a car that was legally parked in the parking lot of Friendship Park in suburban Spokane. The officer also observed a flicker of light emanate from within the parked car and believed that the light was a flame being used to ignite a drug pipe. . . .
>
> Officer Peden stopped, exited the patrol car, and approached the parked car on foot. The officer asked the driver of the parked car, "Where is the pipe?" . . . In response to the question, the driver, James Thorn, removed a pipe from his coat pocket and handed it to Officer Peden.

---

[6] Thorn was decided on Fourth Amendment grounds. It did not, however, involve an application of the Hoderi D. "subjectivity" test and, therefore, retains its validity for purposes of both state and federal constitutional analysis.

Thorn, 129 Wn.2d at 349. Psilocybin mushrooms, a controlled substance, were discovered in a subsequent search incident to Thorn's arrest. Thorn, 129 Wn.2d at 349.

On appeal, Thorn claimed that he was illegally seized when the officer asked, "Where is the pipe?" The Supreme Court disagreed, citing Bostick and Mendenhall for the proposition that an officer does not seize a person merely by striking up a conversation or asking questions. Thorn, 129 Wn.2d at 352.

The court noted that the required approach was to analyze the totality of the circumstances. Thorn, 129 Wn.2d at 352-53. It further noted that Thorn's presence in a parked vehicle was not properly a fact to be assigned much significance.

> [A]s the Bostick court pointed out, the focus of the inquiry is not on whether the defendant's movements are confined due to circumstances independent of police action, but on whether the police conduct was coercive. Bostick, 501 U.S. at 436. . . . [T]he question is not merely whether Thorn felt free to leave, but whether he felt free to terminate the encounter, refuse to answer the officer's question, or otherwise go about his business. Consequently, whether it was more difficult for the defendant to actually leave the scene of the police contact because he was in a parked car is not a significant factor here. See INS v. Delgado, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) (holding that no seizure took place where INS agents interrogated suspected aliens at their workplace despite the fact that the workers may have felt not free to leave because they were at work).

Thorn, 129 Wn.2d at 353. The court concluded that the posing of the question, in the circumstances described, did not "create[] a coercive environment" such that Thorn was seized. Thorn, 129 Wn.2d at 354.

Two years later, in State v. Young, 135 Wn.2d 498, our Supreme Court revisited the arena of seizure analysis, this time deciding the case solely on state

constitutional grounds. In that case, a uniformed, armed deputy sheriff was on patrol in a marked police unit on a late August evening. Shortly before 10:00 p.m., the deputy observed Kevin Young standing on a street corner, speaking to a young woman. The deputy observed nothing to arouse his suspicions. Nevertheless, the deputy stopped his patrol car and got out to speak with Young. He asked Young how he was doing and asked his name, which Young truthfully gave him. The deputy returned to his car. Young, 135 Wn.2d at 502.

The deputy drove a half block from the scene and then pulled over, calling in for a criminal history check on Young. The check revealed that Young "had a very extensive background in narcotics sales." Young, 135 Wn.2d at 502.

As the deputy again began to drive, he looked in his rear view mirror and saw Young standing in the middle of the street, on the crest of a hill, and apparently monitoring the deputy's whereabouts. The deputy turned his car around and drove back toward Young. Young, 135 Wn.2d at 502. In response, Young began walking at a fast pace, moving toward a bushy area near an apartment complex. The deputy

> then speeded up. As [the deputy] drove up the hill, he shined the patrol vehicle spotlight on Young when Young was about three or four feet from a tree. He saw Young walk behind the tree, crouch down, and toss something about the size of a small package into the area near the tree. Young continued walking, now away from the tree, and at a very fast pace. . . .
>
> [The deputy] drove to the opposite side of the street, stopped his patrol car close to the tree, and exited the vehicle. He asked Young to stop. Then he retrieved the object he saw Young dispose of behind the tree.

Young, 135 Wn.2d at 503. The object was a soda can containing a substance that appeared to be rock cocaine. Young, 135 Wn.2d at 503.

The trial court ruled that Young was seized "at the point the deputy illuminated the defendant with the spotlight," and granted a motion to suppress. Young, 135 Wn.2d at 504. The Supreme Court disagreed.

After discussing the analytical difference between federal and state seizure analysis, as set forth above, the court framed the issue as follows:

> [T]he seizure question becomes, was the illumination by the spotlight such a show of authority that a reasonable person would have believed he or she was not free to leave. That Young actually did leave makes no difference; the test is objective.

Young, 135 Wn.2d at 511. To the Supreme Court, the answer was clear. "The shining of the spotlight in this case does not rise to the level of intrusiveness discussed in Mendenhall." Young, 135 Wn.2d at 512-13. The court thus held that

> [t]he illumination by the spotlight did not amount to such a show of authority a reasonable person would have believed he or she was not free to leave, not free simply to keep on walking or continue with whatever activity he or she was then engaged in, until some positive command from [the deputy] issued.

Young, 135 Wn.2d at 513-14.

Because there was no seizure, the court ruled, Young's abandonment of the contraband was not the result of unlawful police conduct and the evidence should not have been suppressed.

A similar result obtained in State v. O'Neill, 148 Wn.2d 564, also decided pursuant to article I, section 7. The facts of the case are striking.

- 14 -

The unchallenged findings in this case establish that on June 7, 1999, Sergeant West was traveling on a road in Bellingham when he saw a car parked in front of a store that had been closed for about an hour. Sergeant West knew that it had been burglarized twice in the previous month. West pulled up behind the car and activated his spotlight in order to see the license plate and run a computer check on the plate. He ran the check, and learned that the vehicle had been impounded within the previous two months due to a drug situation. West noticed that the windows of the parked vehicle were fogged over, and he formed the opinion that someone was in the car. He also believed the car had been there for a period of time sufficient for the windows to fog.

Sergeant West approached the driver's side of the car and shined the light from his flashlight in the driver's face. The driver was later identified as O'Neill. West asked Mr. O'Neill to roll the window down, which he did. Sergeant West asked Mr. O'Neill what he was doing there, and O'Neill answered that he had come from Birch Bay and his car had broken down. He said that his car would not start, and that he was waiting for a friend to come with jumper cables. West asked Mr. O'Neill to try to start the car. O'Neill tried, but the car would not start.

West then asked O'Neill for identification. Mr. O'Neill said that he did not have any on him, and then stated that his driver's license had been revoked. West asked for registration and insurance papers. Mr. O'Neill produced registration that showed that the vehicle was registered to Harold Macomber. There was a handwritten date of birth on the registration. Sergeant West asked O'Neill if he was Macomber, and O'Neill said he was. West asked O'Neill to step from the vehicle and then patted him down for identification.

When Mr. O'Neill got out of the car, Sergeant West saw a spoon on the floorboard next to the driver's side. West saw a substance on the spoon that looked granular with a slickness or wet look. Based upon his training and experience, West thought that a narcotic had been cooked on the spoon. When West asked Mr. O'Neill about the spoon, O'Neill said that it was an ice cream spoon.

West then asked O'Neill for consent to search the vehicle. Mr. O'Neill said "no" and said that Sergeant West needed a warrant to search the car. West responded that he did not need a warrant but could simply arrest O'Neill for the drug paraphernalia and search the car incident to that arrest. West asked for consent

again. The discussion went back and forth several times, with O'Neill eventually consenting. West got into the car and saw a pipe that he recognized as drug paraphernalia on the driver's seat. He moved the pipe and sat down. From a sitting position, he could see a baggie in the open containing what he believed to be cocaine.

West arrested O'Neill, who was charged with unlawful possession of a controlled substance.

O'Neill, 148 Wn.2d at 571-73.

In resolving the case, the Supreme Court reiterated its view of policing:

Citizens of this state expect police officers to do more than react to crimes that have already occurred. They also expect the police to investigate when circumstances are suspicious, to interact with citizens to keep informed about what is happening in a neighborhood, and to be available for citizens' questions, comments, and information citizens may offer.

O'Neill, 148 Wn.2d at 576.

Accordingly, we reject the premise that under article I, section 7 a police officer cannot question an individual or ask for identification because the officer subjectively suspects the possibility of criminal activity, but does not have a suspicion rising to the level to justify a Terry stop. Once a seizure is found, however, the reasonableness of the officer's suspicion and the factual basis for it are relevant in deciding the validity of the seizure.

O'Neill, 148 Wn.2d at 577 (footnote omitted). Indeed, the subjective motivation of the officer was not germane; rather "the question of whether a seizure has been effected is an objective determination based upon the actions of the law enforcement officer." O'Neill, 148 Wn.2d at 577 n.1.

The Supreme Court closely analyzed the officer's actions to see if "there was any show of authority on the officer's part," O'Neill, 148 Wn.2d at 577, that would constitute a seizure.

When Sergeant West pulled into the parking lot he shined his spotlight on O'Neill's car. No seizure occurred at that point.

Young, 135 Wn.2d at 510-13. West then approached the car and shined a flashlight into it, illuminating the driver and the passenger compartment. The use of a flashlight to illuminate at night what is plainly visible during the day is not an unconstitutional intrusion into a citizen's privacy interests. Young, 135 Wn.2d at 513 n. 8. As Young notes, this court in State v. Rose, 128 Wn.2d 388, 909 P.2d 280 (1996) reasoned that use of a flashlight is not an intrusive method of viewing what is there to be seen but for the dark of night. Young, 135 Wn.2d at 513 n. 8 (quoting Rose, 128 Wn.2d at 398-99). A flashlight is, instead, an exceedingly common device that can do no more than reveal what would be visible in natural light. This court concluded: "[W]e hold that the fact that a flashlight is used does not transform an observation which would fall within the open view doctrine during daylight into an impermissible search simply because darkness falls." Rose, 128 Wn.2d at 398–99, *quoted in* Young, 135 Wn.2d at 513 n. 8. Thus, in Young, this court found no disturbance of private affairs under article I, section 7 where a police officer shined a spotlight on a person in a public street at night, under the same reasoning employed in Rose. Sergeant West's use of a flashlight to see what would be observable in daylight was not an unreasonable intrusion into O'Neill's private affairs.

Sergeant West then asked O'Neill to roll his window down. It is not improper for a law enforcement officer to engage a citizen in conversation in a public place. Young, 135 Wn.2d at 511. O'Neill was parked in a public place. The occupant of a car does not have the same expectation of privacy in a vehicle parked in a public place as he or she might have in a vehicle in a private location—he or she is visible and accessible to anyone approaching. Significantly, this court has concluded that there was no seizure of a person in a vehicle parked at night in the parking lot of a closed public park, where a police officer approached the vehicle after seeing a light in it, and asked, "'Where is the pipe?'" Thorn, 129 Wn.2d at 349. . . . [W]here a vehicle is parked in a public place, the distinction between a pedestrian and the occupant of a vehicle dissipates. . . .

The occupant is free, of course, to refuse an officer's request to open the window, and is under no obligation to engage in conversation with the officer. By the same token, the occupant is just as free to open a window and engage in conversation. The officer's approach and conversation with O'Neill did not, because O'Neill was inside a vehicle, rise to the level of an unconstitutional intrusion into private affairs.

- 17 -

> O'Neill next challenges the propriety of Sergeant West's request that he try to start the vehicle. The unchallenged findings do not suggest any show of authority that would lead a reasonable person to believe he was being detained as a result of this request.

O'Neill, 148 Wn.2d at 578-80.

The court next addressed O'Neill's argument that the officer's request for O'Neill's identification constituted a seizure. The court rejected this contention, "adher[ing] to our analysis in Young" that such a request does not elevate an encounter into a detention. O'Neill, 148 Wn.2d at 580 (citing Young, 135 Wn.2d at 511).

Ultimately, the court concluded that "Sergeant West's actions in their entirety, viewed objectively, do not warrant the conclusion there was a show of authority amounting to a seizure prior to the request that O'Neill exit the car." O'Neill, 148 Wn.2d at 581. By that time, however, O'Neill had already confessed to having driven the vehicle with a revoked driver's license. Thus, the officer had "probable cause to believe that O'Neill was involved in criminal activity: driving while his license was revoked." O'Neill, 148 Wn.2d at 582.

In summary, then, the Supreme Court ruled that the following actions of the officer, considered in their totality, did not constitute a seizure: (1) pulled his patrol car into a closed store's parking lot late at night; (2) pulled up behind a parked vehicle; (3) shined his spotlight on the vehicle; (4) approached the vehicle on foot; (5) shined a flashlight into the sole occupant's face; (6) asked the occupant to roll down the driver's side window; (7) asked the occupant for his purpose in being parked there; (8) in response to being told that the car would

not start, asked the driver to attempt to start it; (9) asked the occupant for identification; and (10) asked the occupant for registration and insurance.

The final case bearing mention is State v. Harrington, 167 Wn.2d 656. In that case, the Supreme Court held that "the officers' actions, when viewed cumulatively, impermissibly disturbed Harrington's private affairs," 167 Wn.2d at 660, thus constituting a seizure.

The court began its analysis by discussing Rankin, O'Neill, Young, and Mendenhall, noting that, "[i]n Young, we embraced [Mendenhall's] nonexclusive list of police actions likely resulting in seizure." Harrington, 167 Wn.2d at 664. The court applied that settled law to these facts:

> At roughly 11:00 p.m. on August 13, 2005, Richland Police Officer Scott Reiber was driving his marked patrol car north on Jadwin Avenue in Richland. Reiber noticed Harrington walking south along the sidewalk. Reiber made a U-turn, drove south past Harrington, and pulled into a driveway. The officer did not activate his lights or siren. Reiber exited his patrol car and approached Harrington who was then walking toward the officer. Reiber testified he "contact[ed]" Harrington because "[t]hat area, late at night, a gentleman walking—social contact. See what he was up to, just to talk."
>
> When close enough, Reiber asked, "Hey, can I talk to you" or "Mind if I talk to you for a minute?" Harrington replied either "Yeah" or "Yes." The two men began a conversation, standing approximately five feet apart. Reiber positioned himself off the sidewalk on the grass. Reiber testified Harrington's path was not obstructed by either Reiber or the patrol car. Reiber asked Harrington where he was coming from. Harrington responded he was coming from his sister's house. Asked where his sister lived, Harrington replied he did not know. Reiber considered that lack of knowledge "a little suspicious." Reiber testified Harrington was acting "quite nervous, pretty fidgety" throughout the encounter. Reiber also noticed bulges in Harrington's pockets. Early in the encounter Harrington put his hands into his pockets, prompting Reiber to ask Harrington to remove his hands. Harrington took his hands out when initially asked but repeatedly put his hands back

into his pockets before quickly removing them again. Their conversation lasted between two and five minutes.

During that time frame Washington State Patrol Trooper William Bryan coincidentally drove south past the encounter. After noticing an officer speaking alone with an individual, Bryan made a U-turn and parked his marked patrol car in the northbound lane of traffic, approximately 10 to 30 feet from Harrington and Reiber. Bryan exited his car and stood 7 or 8 feet from Harrington. Bryan did not speak to either Harrington or Reiber. When testifying Bryan could not recall whether he activated any pattern of lights when he made the U-turn or when he parked his car in the lane.

After Bryan appeared Reiber asked if he could pat down Harrington for officer safety. Reiber told Harrington he was not under arrest at that moment. Harrington answered, "Yeah." During the pat down Reiber felt a hard, cylindrical object in Harrington's front right pocket. Reiber asked what it was, to which Harrington responded, "My glass." Asked for clarification, Harrington added, "My meth pipe." Reiber then told Harrington he was under arrest. Incident to arrest the officers searched Harrington and discovered a pipe and baggie. Both contained methamphetamine.

Harrington, 167 Wn.2d at 660-62 (citations to the record omitted).

The court began by noting that Officer Reiber's actions in making a U-turn, pulling into a driveway, leaving his patrol car, approaching Harrington, asking to speak with him, and asking Harrington questions did not "rise to the level of a seizure." Harrington, 167 Wn.2d at 665.

At this point, the court noted, the second officer arrived. A scene with two police officers and a lone citizen meets one of the Mendenhall seizure criteria, the court noted. Harrington, 167 Wn.2d at 666. Observing that "Harrington undoubtedly noted Bryan's presence," the court nevertheless did not find that a seizure had yet occurred. Harrington, 167 Wn.2d at 666.

Moments later, Reiber asked Harrington to remove his hands from his pockets. Reiber conceded that "he asked Harrington to remove his hands from

- 20 -

his pockets in order 'to control Mr. Harrington's actions.'" Harrington, 167 Wn.2d at 667 (citation to the record omitted). Nevertheless, the Supreme Court did not hold that Harrington was yet seized at this point in the interaction with the officers.

Reiber then asked Harrington to consent to a frisk—a manual search of Harrington's person. "When Reiber requested a frisk, the officers' series of actions matured into a progressive intrusion substantial enough to seize Harrington. A reasonable person would not have felt free to leave due to the officers' display of authority." Harrington, 167 Wn.2d at 669-70. Thus, the court ruled that Harrington's consent to the frisk—which resulted in the discovery of contraband—was the product of his illegal seizure, the officers not having a lawful basis to detain him prior to the frisk, and ordered the evidence of the contraband suppressed.

III

The trial court's ruling herein was well-supported by the case law. First, none of the Mendenhall factors were present in this police-citizen interaction. There was not "the threatening presence of several officers"[7] (there were two officers present and two citizen suspects—at the time in question, Larson was engaged solely in a one-on-one exchange with Sergeant Hart); there was not a "display of a weapon by an officer;[8] there was not "some physical touching of the person of" Larson;[9] nor was there "the use of language or tone of voice indicating

---

[7] Mendenhall, 446 U.S. at 554.
[8] Mendenhall, 446 U.S. at 554.
[9] Mendenhall, 446 U.S. at 554.

that compliance . . . might be compelled."[10] As noted by the United States Supreme Court and our Supreme Court, "'[i]n the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.'" Young, 135 Wn.2d at 512 (quoting Mendenhall, 446 U.S. at 554-55).

Second, as the occupant of a motor vehicle parked in a public place, Larson was constitutionally indistinguishable from a pedestrian. O'Neill, 148 Wn.2d at 579; State v. Knox, 86 Wn. App. 831, 840, 939 P.2d 710 (1997), overruled on other grounds by O'Neill. That she was asked to step from the car and move several feet away is no more significant than if she had been standing next to her car and been asked to move several feet away.

Third, Larson misunderstands the import of O'Neill. Citing O'Neill, Larson claims that she was seized when she was asked to step from the car because the Supreme Court held that O'Neill was seized at that time. This argument misses a major point of the O'Neill analysis: O'Neill was unquestionably seized at this point because he had by then *admitted to committing a crime*. O'Neill was not free to go. Indeed, O'Neill was not a "reasonable person" for the purposes of seizure analysis because he had admitted to being a *guilty* person. Nothing in O'Neill supports Larson's contention that she was seized at this point.[11]

---

[10] Mendenhall, 446 U.S. at 554.

[11] During oral argument, counsel for Larson argued that any request by an officer to exit one's vehicle constitutes a *per se* seizure. Wash. Court of Appeals oral argument, State v. Larson, No. 74766-5-I (April 14, 2017), at 22 min. to 22 min. 22 sec. (on file with court). As discussed herein, O'Neill does not stand for any such proposition.

Finally, Larson's contention that she was seized when Sergeant Hart asked her to move several feet and then asked her questions about drug use likewise fails. An officer does not seize a person by merely striking up a conversation or asking questions. O'Neill, 148 Wn.2d at 579; Thorn, 129 Wn.2d at 352.

Larson's claim that she was unlawfully seized fails. Accordingly, her contention that an unlawful seizure vitiated her consent to the search also fails. There was no error.

IV

Larson requests that no costs associated with her appeal be assessed against her, as she was found indigent by the trial court. Should the State seek an award of appellate costs, recently amended RAP 14.2 will govern the request.

Affirmed.

We concur:

- 23 -